**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Statesville Division**
**5:25-CV-157**

| | |
|---|---|
| WATAUGA COUNTY VOTING RIGHTS TASK FORCE, COMMON CAUSE, DR. RAY RUSSELL, LARRY TURNBOW, CHARLIE WALLIN, DR. JAMES FENWICK, JR., LAURIE FLEMING, PATRICIA DALE, and KINNEY RAY BAUGHMAN, <br><br> Plaintiffs, <br><br> v. <br><br> WATAUGA COUNTY BOARD OF ELECTIONS, ERIC ELLER in his official capacity as a member of the Watauga County Board of Elections, TERRY CIRONE in her official capacity as a member of the Watauga County Board of Elections, PAMELA HUSS CLINE in her official capacity as a member of the Watauga County Board of Elections, ELAINE ROTHENBERG in her official capacity as a member of the Watauga County Board of Elections, and LETA COUNCILL in her official capacity as a member of the Watauga County Board of Elections, <br><br> Defendants. | **COMPLAINT** <br><br> **Case No. _____** |

## INTRODUCTION

In 2023, the North Carolina General Assembly enacted Senate Bill 759 on strict party lines. That legislation replaced Watauga County's longstanding system for electing its County Commission from residency districts, and imposed unconstitutional, malapportioned electoral districts with large population deviations. The new districts were drawn without meaningful local input. The legislation packed disfavored voters into two overpopulated districts while creating three underpopulated districts for favored voters. The maximum population deviation from largest

1

to smallest district is just under 10%, the threshold at which population deviations become presumptively unconstitutional.

The County Commission recognized that the General Assembly's plan was unnecessary and unpopular, so in June 2024, the Commission used the statutory process available to all North Carolina counties in N.C. General Statutes §§ 153A-58 *et seq.* to propose a new plan for selecting the County Commission that voters could approve by referendum in the 2024 general election. The referendum proposed that three Commission members be elected from electoral districts with much smaller population deviations than those drawn by the General Assembly, and that voters from across the county elect two members at-large.

In response to the planned referendum, the General Assembly enacted a second bill just days after the referendum was announced. That bill, Senate Bill 912, barred any referendum approved by Watauga County voters under N.C. General Statute § 153A-61 from taking effect until the **2034** elections, after the next decennial census. The voters of Watauga County would still vote on the referendum approved by the County Commission, but if a majority cast their votes in favor, the referendum would not take effect.

Senate Bill 912 also imposed the General Assembly's unconstitutional local districts on the Watauga County Board of Education. As it did with the County Commission, the General Assembly replaced the county's longstanding practice of electing Board of Education members from residency districts with the same malapportioned, unconstitutional electoral districts.

In the November 5, 2024 General Election, Watauga County voters overwhelmingly rejected the districts drawn by the General Assembly. The voters of Watauga County approved the County Commission's plan by a 42% margin: more than 71% of the ballots were cast in favor,

while only 29% opposed. A majority of voters supported the referendum in each of the county's twenty precincts.

But the referendum results will have no effect, and the voters of Watauga County will be stuck with unconstitutional districts for their County Commission and Board of Education, unless this Court intervenes. The General Assembly's interference in Watauga County local elections violates Plaintiffs' constitutional rights in several ways. The districts themselves violate the Equal Protection Clause's guarantee to all citizens of a vote on equal grounds. The prohibition on giving effect to resolutions and referenda regarding the manner of selecting the Watauga County Commission violates plaintiffs' right to equal protection, burdens their right to vote, discriminates against them based on their viewpoint, and amounts to unconstitutional retaliation.

Fundamentally, the people of Watauga County have no choice but to petition this Court for urgently needed relief from Defendants' ongoing violations of their First and Fourteenth Amendment rights.

## PARTIES

1.      Plaintiff Watauga County Voting Rights Task Force (the "Task Force") brings this action on behalf of itself, its constituents and supporters, and its members. The Task Force is a volunteer organization that serves eligible voter constituents throughout Watauga County by advocating for voting rights on a nonpartisan basis, registering and educating voters, and defending voting rights since 2014. The Task Force is committed to ensuring that voting is accessible to every eligible voter who wishes to participate in our democracy and that the votes of all eligible voters are counted.

2.      The mission of the Task Force is to empower Watauga County voters through non-partisan initiatives that facilitate voter registration, provide essential voting information, and foster

a culture of active citizenship, ensuring that every voice is heard in the democratic process: "Everyone deserves to exercise their right to vote." It furthers this mission through volunteer-run voter registration drives, voter education and information sessions, volunteer training, community outreach, a voter information texting service, and defending individual voters who have their ballots and voting rights challenged. The Task Force's volunteers regularly answer questions about where to vote, what is required, and how to take advantage of early voting opportunities.

3. The Task Force was organized in response to the Watauga County Board of Elections' attempt to eliminate a crucial early voting location, which thousands of student voters relied on, for the 2014 general election. Leaders of the Task Force challenged the early voting plan in Wake County Superior Court and prevailed. *See Anderson v. N.C. State Bd. Of Elections*, No. 14CVS12648, 2014 WL 6771270, at \*1 (N.C. Super. Ct. Oct. 3, 2014). After the Task Force represented and defended Watauga voters whose votes had been challenged in the 2022 election, in 2023, the leaders of the Task Force sued in federal district court on behalf of Watauga voters who stood to be disenfranchised and denied due process rights as a result of Senate Bill 749. That case was settled with the Task Force securing relief for all voters statewide affected by S 749. *See* Stipulation and Consent Judgment, *Voto Latino v. Hirsch*, Case No. 1:23-cv-861-TDS-JEP (M.D.N.C. Apr. 22, 2025).

4. Plaintiff Common Cause is a nonprofit, nonpartisan membership organization incorporated under the laws of the District of Columbia and registered to do business in North Carolina. Pursuant to its bylaws, Common Cause is organized and operated as a membership organization and brings this action in a representative capacity on behalf of its members.

5. Common Cause is a grassroots organization dedicated to empowering all people in North Carolina to make their voices heard in the political process. Common Cause's members live

4

across North Carolina and include registered voters in Watauga County. Through its members in North Carolina and Watauga County, Common Cause works to create open, honest, and accountable government that serves the public interest, including by protecting voting rights.

6. Common Cause has defined who qualifies as a member. Under its definition, a "member" of Common Cause is any individual who, within the past two years, (a) made a financial contribution to the organization; or (b) has taken meaningful action in support of Common Cause's advocacy work. Such meaningful actions include, but are not limited to, signing petitions directed at government officials; participating in letter-writing or phone-banking campaigns; attending town halls, workshops, or rallies organized by Common Cause; or engaging in other activities designed to advance the organization's mission.

7. Common Cause represents the interests of its members in this litigation and sues on behalf of its North Carolina and Watauga County members, who would have standing to sue individually because they face direct injury from the violation of their constitutional rights. Litigating this matter on behalf of its members is germane to Common Cause's mission of protecting voting rights, and the relief requested, declaratory and injunctive relief, does not require the participation of individual members.

8. Plaintiff Dr. Ray Russell is a former member of the Watauga County Board of County Commissioners who resides in Boone, North Carolina. He is a citizen of the United States and a Watauga County registered Democratic voter who intends to vote in future elections for the Watauga County Commission, the Watauga County School Board, and other offices. Under the new redistricting plans that devalue his vote, Dr. Russell lives in District 2. He desires that his vote be valued equally to the votes of residents of other Watauga County Commission and School Board districts.

5

9.      Plaintiff Larry Turnbow is a former member of the Watauga County Board of County Commissioners who resides in Blowing Rock, North Carolina.  He is a citizen of the United States and a Watauga County registered Democratic voter who intends to vote in future elections for the Watauga County Commission, the Watauga County School Board, and other offices.  Under the new redistricting plans that devalue his vote, Mr. Turnbow lives in District 5.  He desires that his vote be valued equally to the votes of residents of other Watauga County Commission and School Board districts.

10.      Plaintiff Charlie Wallin is a former member of the Watauga County Board of County Commissioners who resides in Boone, North Carolina.  He is a citizen of the United States and a Watauga County registered Democratic voter who intends to vote in future elections for the Watauga County Commission, the Watauga County School Board, and other offices.  Under the new redistricting plans that devalue his vote, Mr. Wallin lives in District 4.  He desires that his vote be valued equally to the votes of residents of other Watauga County Commission and School Board districts.

11.      Plaintiff Dr. James Fenwick, Jr. resides in Boone, North Carolina.  He is a citizen of the United States and a Watauga County registered Democratic voter who intends to vote in future elections for the Watauga County Commission, the Watauga County School Board, and other offices.  Under the new redistricting plans that devalue his vote, Dr. Fenwick lives in District 4.  He desires that his vote be valued equally to the votes of residents of other Watauga County Commission and School Board districts.

12.      Plaintiff Laurie Fleming resides in Boone, North Carolina.  She is a citizen of the United States and a Watauga County registered unaffiliated voter who intends to vote in future elections for the Watauga County Commission, the Watauga County School Board, and other

offices. Under the new redistricting plans that devalue her vote, Ms. Fleming lives in District 2. She desires that her vote be valued equally to the votes of residents of other Watauga County Commission and School Board districts.

13.     Plaintiff Patricia Dale resides in Boone, North Carolina. She is a citizen of the United States and a Watauga County registered Democratic voter who intends to vote in future elections for the Watauga County Commission, the Watauga County School Board, and other offices. Under the new redistricting plans that devalue her vote, Ms. Dale lives in District 1. She desires that her vote be valued equally to the votes of residents of other Watauga County Commission and School Board districts.

14.     Plaintiff Kinney Ray Baughman resides in Vilas, North Carolina. He is a citizen of the United States and a Watauga County registered Democratic voter who intends to vote in future elections for the Watauga County Commission, the Watauga County School Board, and other offices. Under the new redistricting plans that devalue his vote, Mr. Baughman lives in District 3. He desires that his vote be valued equally to the votes of residents of other Watauga County Commission and School Board districts.

15.     Defendant Watauga County Board of Elections is a legal entity created by state statute and empowered by state law to administer local elections in Watauga County.

16.     Defendant Eric Eller is the Chair of the Watauga County Board of Elections. He is sued only in his official capacity.

17.     Defendant Terry Cirone is a member of the Watauga County Board of Elections. She is sued only in her official capacity.

18.     Defendant Pamela Huss Cline is a member of the Watauga County Board of Elections. She is sued only in her official capacity.

19.     Defendant Elaine Rothenberg is a member of the Watauga County Board of Elections.  She is sued only in her official capacity.

20.     Defendant Leta Councill is a member of the Watauga County Board of Elections.  She is sued only in her official capacity.

## JURISDICTION AND VENUE

21.     Plaintiffs bring this action under 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and the Declaratory Judgment Act.

22.     This Court has jurisdiction over the subject-matter of this action under 28 U.S.C. §§ 1331, 1343(a)(3), and 1357.

23.     This Court has personal jurisdiction over the Defendants, who are sued in their official capacities and reside within this state, pursuant to Fed. R. Civ. P. 4(k)(1)(A).

24.     This Court is the proper venue for this matter under 28 U.S.C. § 1391(b) because the Defendants reside in this district and because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

25.     This Court has jurisdiction to grant declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

26.     Defendants do not possess immunity under the Eleventh Amendment to the United States Constitution because of their direct roles in enforcing the unconstitutional laws that Plaintiffs challenge in this action.

## FACTS

### *The Enactment of Senate Bill 759*

27.     Senate Bill 759 replaced Watauga County's longstanding system for electing its County Commission from residency districts, and imposed unconstitutional, malapportioned electoral districts with large population deviations.

28.     Senate Bill 759 was introduced by Senator Ralph Hise on October 18, 2023, and enacted by the North Carolina General Assembly one week later on October 25, 2023.

29.     Senate Bill 759 passed the North Carolina House and the North Carolina Senate on party line votes.  All Republicans present voted in favor of the legislation and all Democrats present voted against the legislation.

30.     Prior to the enactment of Senate Bill 759, the Commission consisted of five members who had to reside in residency districts, and were elected in countywide elections.  They served staggered terms, with elections held for three seats in even-numbered years.  The top two vote getters were elected to four-year terms, and the third finisher was elected to a two-year term.

31.     On information and belief, this system had existed in Watauga County for nearly half a century and enjoyed wide support in the community.

32.     Senate Bill 759 established five single-member electoral districts for the Commission.  One member would be elected from each district and would be required to reside in the district from which they were elected.

33.     Senate Bill 759 provides that the members representing Districts 3, 4, and 5 would be elected to four-year terms in 2024.  The members representing Districts 1 and 2 will not be elected until 2026.

9

34.  Senate Bill 759 thus discriminates against voters in Districts 1 and 2 by denying them the opportunity to select their own representatives to the County Commission until 2026. On information and belief, none of the five current County Commissioners resides in District 1 or 2.

35.  The districts established by Senate Bill 759 are shown in this map.



36.  The districts drawn in Senate Bill 759 have significant population deviations. Specifically, the populations are as follows:

- District 1: 11,342

- District 2: 11,354

- District 3: 10,305

- District 4: 10,646

- District 5: 10,439

37. If all districts in Senate Bill 759 had an equal population, each district's population would be 10,817. This means that each district's deviation from equal distribution is as follows:

- District 1: +4.85%

- District 2: +4.96%

- District 3: -4.73%

- District 4: -1.58%

- District 5: -3.49%

38. The total deviation from largest district to smallest district is 9.7%.

39. The population deviations present in each district in Senate Bill 759 did not result from the use or predominance of traditional redistricting criteria including, for example, compactness, keeping precincts whole, avoiding unnecessary political subdivision splits, or core preservation.

40. In fact, the General Assembly could have chosen to enact a redistricting plan for the Watauga County Commission that contained five electoral districts and performed better than Senate Bill 759 on each of the aforementioned traditional redistricting criteria.

41. But the General Assembly declined to enact such a plan because it preferred to systematically use "illegitimate reapportionment factors," *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016), when designing the districts in Senate Bill 759. *See infra* ¶¶ 65–79.

*Traditional Redistricting Criteria*

42. Before turning to the specific allegations, it is critical to note the traditional redistricting principles that legislatures ordinarily apply when redrawing electoral districts. These established criteria, such as compactness, respect for political subdivisions and precinct lines,

preservation of core districts, and compliance with the Voting Rights Act, are widely recognized in case law, academic commentary, and past North Carolina practice as legitimate bases for redistricting.

43.     In enacting Senate Bill 759, however, the General Assembly did not meaningfully apply these traditional, legitimate criteria. Instead, as detailed below in paragraphs 44–67, the legislature ignored each of them. And as outlined in paragraphs 68–81, the legislature relied instead on illegitimate considerations that contravene constitutional norms. Together, these two sections demonstrate both what the legislature failed to do and what it improperly chose to do.

*Compactness*

44.     Because the use of traditional redistricting criteria, such as compactness, did not predominate in the creation of Senate Bill 759, some of the districts contain unusual shapes.

45.     For example, the Senate Bill 759 Plan adds several blocks, pictured in green, to whole precincts, shown in purple, to District 1, such that the district appears to have a claw-like appendage.



12

46.     When measured against alternative five-district reapportionment plans, Senate Bill 759 performs poorly when compared to compactness metrics.

47.     The General Assembly could have enacted an alternative five-district reapportionment plan that contained significantly smaller population deviations but contained fewer unusual shapes and better compactness scores.

48.     But the General Assembly declined to enact such a plan because it preferred to systematically use illegitimate reapportionment factors when designing each of the districts in Senate Bill 759.

*Unnecessary Precinct Splits*

49.     The districts drawn in Senate Bill 759 unnecessarily split multiple precincts in several different ways.  Precinct 7 was split into three districts, with residents assigned to Districts 1, 3, and 4, as shown below.



50. Precinct 14 was split into two districts, with several noncontiguous pockets assigned to District 2, and the remainder of the precinct assigned to District 4, as shown below.



51. These unnecessary precinct splits were not designed to equalize population between the affected districts.

52. District 1 is comprised of three entire precincts and parts of Precinct 7. If District 1 were comprised solely of the three entire precincts within its borders, its population would be just 1.11% below the ideal size.

53. Instead, Senate Bill 759 created significant overpopulation of the district by adding 645 voters from Precinct 7 to create a district that is 4.85% above the ideal size.

54. If the Precinct 7 voters pulled into District 1 were instead assigned to District 4, it would have reduced the significant underpopulation of that district and would have brought both districts much closer to the ideal size.

55.     Similarly, District 2 takes four separate, noncontiguous blocks of voters from Precinct 14 to create the most overpopulated district in the plan, with 537 more voters than population equality would require.  If those voters were left in District 4, it would reduce the overpopulation of District 2 and increase the underpopulation in District 4, resulting in both districts being closer to the ideal size.

56.     The General Assembly could have enacted an alternative five-district reapportionment plan that contained fewer precinct splits than Senate Bill 759.

57.     But the General Assembly declined to enact such a plan because it preferred to systematically use illegitimate reapportionment factors when designing each of the districts in Senate Bill 759.

*Unnecessary Political Subdivision Splits*

58.     The districts drawn in Senate Bill 759 also unnecessarily split political subdivisions. For example, inhabited parts of the Town of Boone are in all five districts.



15

59. These unnecessary political subdivision splits were not designed to equalize population between the affected districts.

60. The General Assembly could have enacted an alternative five-district reapportionment plan that contained fewer political subdivision splits than Senate Bill 759.

61. But the General Assembly declined to enact such a plan because it preferred to systematically use illegitimate reapportionment factors when designing each of the districts in Senate Bill 759.

*Core Preservation*

62. The large population deviations in Senate Bill 759 did not result from the General Assembly's prioritization of core preservation—the extent to which the districts in a new plan preserve the cores of the districts in the previous plan.



63. On average, the districts in Senate Bill 759 preserve roughly 50% of the cores of the prior residential districts.

64. Districts 3, 4, and 5 all preserve less than 34% of the cores of their counterparts in the previous plan.

65. Senate Bill 759's marginal performance on core preservation was not designed to equalize population between the districts.

66. The General Assembly could have enacted an alternative five-district reapportionment plan that preserved more of the residential districts in the previous plan than Senate Bill 759 did.

67. But the General Assembly declined to enact such a plan because it preferred to systematically use illegitimate reapportionment factors when designing each of the districts in Senate Bill 759.

*Illegitimate Reapportionment Factors*

68. During the debate on Senate Bill 759, the legislation's sponsor, Senator Ralph Hise, offered justifications for the new plan. For example, he suggested that the new plan was designed to reduce the influence of students in the electoral process. Specifically, he said that the bill was motivated by "the predominance of the university and others in the electoral process." Hearing on S 759 Before the H. Comm. on Redistricting, N.C. Gen. Assembly (Oct. 24, 2023); *see also* Hearing on S 759 Before the S. Comm. on Redistricting and Elections, N.C. Gen. Assembly (Oct. 23, 2023) (attributing the shift from residential to electoral districts to "a longtime standing conflict between the influence of the university and others within the county").

69. Although the Commissioners had previously been required to live in residency districts representing different parts of Watauga County, Senator Hise also justified the shift to

17

electoral districts as a means of providing representation to residents who lived in the "outer parts of the county."  Hearing on S 759 Before the H. Comm. on Redistricting, N.C. Gen. Assembly (Oct. 24, 2023).

70.     The population deviations between the districts in Senate Bill 759 reflect the General Assembly's use of illegitimate reapportionment factors including partisan advantage and the other criteria discussed by Senator Hise: geographic favoritism and an effort to dilute the votes of Appalachian State University students, whom he perceived to be temporary residents.

71.     The two overpopulated districts are Districts 1 and 2.

72.     The three underpopulated districts are Districts 3, 4, and 5.

73.     Districts 1 and 2, the systematically overpopulated districts, consistently perform for Democrats.  Specifically, the Democratic voters in Districts 1 and 2 will consistently have the power to elect the candidates of their choice as long as Senate Bill 759 remains in effect.

74.     Districts 3, 4, and 5, the systematically underpopulated districts, consistently perform for Republicans.   Specifically, the Republican voters in Districts 3, 4, and 5 will consistently have the power to elect the candidates of their choice as long as Senate Bill 759 remains in effect.

75.     Senate Bill 759 thus reflects the use and/or predominance of an illegitimate reapportionment factor: partisan advantage.  The Plan dilutes the votes of Democratic voters by systematically overpopulating the districts in which Democrats have the opportunity to elect their candidates of choice and systematically underpopulating the districts in which Republicans have the opportunity to elect their candidates of choice.

76.     Districts 1 and 2, the systematically overpopulated districts, are also mostly comprised of urban residents.

77.     Districts 3, 4, and 5, the systematically underpopulated districts, are mostly comprised of rural residents.

78.     Senate Bill 759 thus reflects the use and/or predominance of an illegitimate reapportionment factor: geographic favoritism.  The Plan dilutes the votes of urban voters by systematically overpopulating the districts in which urban voters have the opportunity to elect their candidates of choice and systematically underpopulating the districts in which rural voters have the opportunity to elect their candidates of choice.

79.     Districts 1 and 2, the systematically overpopulated districts, are also the districts that contain most of the Appalachian State University campus and its constituents.

80.     Districts 3, 4, and 5, the systematically underpopulated districts, contain comparatively fewer parts and/or no parts of the Appalachian State University campus and fewer of its constituents.

81.     Senate Bill 759 thus reflects the use and/or predominance of an illegitimate reapportionment factor: discrimination against perceived temporary residents.  The Plan dilutes the votes of perceived temporary residents by systematically overpopulating the districts in which these voters have the opportunity to elect their candidates of choice and systematically under-populating the districts in which voters who are perceived to be permanent residents have the opportunity to elect their candidates of choice.

*The County Commission's Response*

82.     N.C. General Statute § 153A-60 empowers each county commission to initiate an alteration to its structure and manner of selection by approving a resolution defining new districts and submitting the resolution to the voters of the county to approve by referendum.

83.     On June 18, 2024, the Commission adopted a resolution pursuant to N.C. General Statute § 153A-60.  The resolution adopted by the Commission sought to submit a referendum to the voters of Watauga County to adopt a different plan for selecting the County Commission than that enacted in Senate Bill 759.

84.     The resolution adopted by the Commission proposed to create three electoral districts and two county-wide at-large seats.

85.     The Commission had directed the mapmaker to draw a three-district plan, forgoing consideration of voter data, and avoiding split precincts.

86.     The districts proposed in the referendum had minimal population deviations. Specifically, the populations are as follows:

- District 1 – 18,376

- District 2 – 17,758

- District 3 – 17,952

87.     If all districts had an even population, it would be 18,029.  This means that the deviation from equal distribution is as follows:

- District 1: +1.92%

- District 2: -1.5%

- District 3: -0.43%

88.     The total deviation from smallest to largest district was 3.43%.

89.     No precincts were split in the districts adopted by the County Commission and proposed to the voters by referendum.

90.     After it was adopted by the County Commission in June 2024, the referendum was set to be on the November 2024 General Election ballot presented to all Watauga County voters.

*The General Assembly Enacts Senate Bill 912*

91.     Just nine days after the Watauga County Commission approved the resolution, the General Assembly enacted Senate Bill 912.

92.     Section 1 of Senate Bill 912 mandated that, starting in 2026, the members of the Watauga County Board of Education would be elected from the same five County Commission districts enacted in Senate Bill 759.  Section 2 of Senate Bill 912 ensured that no referendum plan adopted between 2024 and 2032 would ever take effect, thereby placing a severe burden on voting.

93.     Prior to the enactment of Senate Bill 912, the Board of Education was elected at-large in elections held in even-numbered years.  In the general election, the three candidates receiving the most votes would be elected, with the top two candidates elected to four-year terms and the third candidate elected to a two-year term.

94.     Under Senate Bill 912, starting in 2026, Board of Education members will be elected to four-year terms from Districts 1 and 4.

95.     Under Senate Bill 912, starting in 2028, Board of Education members will be elected to four-year terms from Districts 2, 3, and 5.

96.     Again, Senator Hise offered several rationales publicly for adopting five electoral districts for future Board of Education elections.  During the legislative debate, he stated that the purpose of Senate Bill 912 is to align the Board of Education and County Commission districts. Hearing on S 912 Before the S. Comm. on Redistricting and Elections, N.C. Gen. Assembly (June 12, 2024).  Senator Hise explained that Senate Bill 759 was motivated by feedback from residents who felt like they were never represented in county government because of the influence of people

associated with "a state university that [exists] in the middle of the county." *Id.* Further elaborating on the perceived influence of Appalachian State University constituents, Senator Hise stated that "Watauga County is unique in the concept that in a county of 55,000 people you have a university on a very small footprint of temporary and four-year residents that represent 20,000 individuals in that county," which produces "a lot of . . . complaints about the influence that those temporary residents have in these kind of elections." *Id.*

97.     Section 2 of Senate Bill 912 was designed to nullify the potential impact of the county-wide referendum on the method of electing the County Commission, which was scheduled to take place in November 2024.

98.     Section 2 provided that even "[i]f a majority of the voters of Watauga County vote for any referendum conducted under Part 4 of Article 4 of Chapter 153A, … the alteration approved in that referendum shall take effect the first Monday in December following the 2032 general election."

99.     In other words, Section 2 provided that even if the November 2024 referendum was adopted by a majority of Watauga County voters, the plan adopted would not take effect until the 2034 general election.

100.    Because the plan proposed in the November 2024 referendum included three electoral districts, the County Commission would be required to draw new districts by 2034 to take into account population changes identified in the 2030 census. *See* N.C. Gen. Stat. § 153A-22. In effect, Section 2 of Senate Bill 912 ensured that no referendum plan adopted between 2024 and 2032 would ever take effect, including the referendum already approved for inclusion on the 2024 ballot.

101. In adopting Section 2, the General Assembly singled out Watauga County voters. On information and belief, the county commissions and voters of all other North Carolina counties are permitted to use the resolution and referendum provisions of Chapter 153A without any sort of restriction like that imposed by Section 2.

102. Regarding Section 2 of Senate Bill 912, Senator Hise stated that the legislation was necessary to prevent local officials and voters from using the statutory process available to all North Carolina counties and to retaliate against them for working to do so. As he explained, "there is a particular need to lock in" the legislatively-drawn districts because "some commissioners are not happy and are trying to change the districts over the will of the General Assembly." Hearing on S 912 Before the S. Comm. on Redistricting and Elections, N.C. Gen. Assembly (June 12, 2024). According to Senator Hise, under Senate Bill 912, the County Commissioners were "still free to change" the County Commission's redistricting plan, "but the effective date will be after the [next] census." *Id.*

103. On information and belief, the General Assembly was aware of significant constitutional defects in Section 2.

104. The first bill summary prepared by legislative staff attorneys noted that: "In 2017, the United States District Court for the Middle District of North Carolina held that an act passed by the General Assembly prohibiting the City of Greensboro from making changes to the form of city government by initiative or referendum violated the Equal Protection Clause and was therefore unconstitutional. *City of Greensboro v. Guilford County Board of Elections*, 248 F. Supp. 3d 692 (2017)." This language appeared in the next two bill summaries as the bill was amended in the legislative process.

23

105.    The legislature's own bill summary also noted that the process for cities to change their form of government—the restriction of which was found unconstitutional in *City of Greensboro*—is "[s]imilar to the method of changing the form of government for counties."

106.    Senate Bill 912 was also amended in committee to include a severability clause in Section 3, which provided that if any section is held invalid, it does not affect the validity of the other sections.

*Watauga County Voters Overwhelmingly Reject the General Assembly's Districts in the 2024 General Election*

107.    In the 2024 General Election, the voters of Watauga County overwhelmingly approved the referendum proposed by the County Commission to establish a system with three electoral districts and two at-large seats.

108.    In the final tally, more than 71% of Watauga County voters supported the measure, while only 29% of the county's voters opposed the measure.

109.    Demonstrating the measure's widespread support, a majority of voters in each precinct of Watauga County voted in favor of the measure.

110.    Despite its widespread support among county voters, the measure will never take effect and the districts imposed by the General Assembly in Senate Bill 759 will continue to be used in Watauga County because of Senate Bill 912.

**FIRST CAUSE OF ACTION**
**Violation of the Equal Protection Clause**
**Malapportionment of County Commission and School Board Districts**
**42 U.S.C. § 1983**

111.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

112. Section 1983 "allows private parties to sue state actors who violate their 'rights' under 'the Constitution and laws' of the United States." *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2227 (2025).

113. The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amdt. 14, § 1.

114. "Inherent in the equal protection of voting is the requirement that all citizens' votes be weighted equally, a principle that is commonly known as one person, one vote." *Wright v. North Carolina*, 787 F.3d 256, 264 (4th Cir. 2015).

115. "This requirement that all citizens' votes be weighted equally, known as the one person, one vote principle, applies not just to the federal government but also to state and local governments—including school boards and county governing bodies." *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016).

116. "States and localities may comply with the one-person, one-vote principle by designing districts with equal total populations." *Evenwel v. Abbott*, 578 U.S. 54, 71 (2016).

117. "[W]hen drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness." *Id.* at 59.

118. "But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify dispar[i]ties from population-based representation." *Reynolds v. Sims*, 377 U.S. 533, 579–80 (1964) (footnote omitted).

25

119. To succeed, "plaintiffs in one person, one vote cases with population deviations below 10% must show by a preponderance of the evidence that improper considerations predominate in explaining the deviations." *Raleigh Wake Citizens Ass'n*, 827 F.3d at 342.

120. The county commission and school board electoral districts established in Senate Bill 759 contain much larger population deviations than the redistricting plan approved by Watauga County voters in 2024. The maximum population deviation (the difference between the deviations in the largest district and the smallest district) in Senate Bill 759 is 9.70% while the maximum population deviation in the plan approved by Watauga County voters is 3.43%. The relative mean deviation (the sum of the districts' deviations divided by the number of districts) in Senate Bill 759 is 3.93%, while the relative mean deviation in the plan approved by Watauga County voters is 1.28%.

121. The large population deviations in Senate Bill 759 result from the fact that when that plan was drawn, improper factors predominated over traditional redistricting criteria.

122. Specifically, at least three improper factors predominated: partisanship, *see generally Rucho v. Common Cause*, 588 U.S. 684, 708 (2019) (recognizing that judicially manageable standards exist to adjudicate partisanship in the context of one-person, one-vote claims but not partisan gerrymandering claims), geographic favoritism, *see generally Larios v. Cox*, 300 F. Supp. 2d 1320, 1338 (N.D. Ga.) (three-judge panel) ("[F]orty years of Supreme Court jurisprudence have established that the creation of deviations for the purpose of allowing the people of certain geographic regions . . . to hold legislative power to a degree disproportionate to their population is plainly unconstitutional."), *aff'd*, 542 U.S. 947 (2004), and an effort to disfavor college students, *see generally Symm v. United States*, 439 U.S. 1105 (1979) (affirming three-judge panel decision recognizing that burdening the voting rights of college students can violate the Fourteenth

26

Amendment); *Davis v. Mann*, 377 U.S. 678, 691 (1964) (rejecting the "argument that the underrepresentation of Arlington, Fairfax and Norfolk is constitutionally justifiable since it allegedly resulted in part from the fact that those areas contain large numbers of military and military-related personnel").

123. The improper predominance of partisanship resulted from legislators' desire to strengthen the value of Republican votes at the expense of diluting Democratic votes.

124. This resulted in a systematic overpopulation of the districts where a majority of voters in recent elections have supported Democrats. Specifically, Districts 1 and 2, whose residents have generally supported Democrats in recent elections, have population deviations of 4.85% and 4.96%. In contrast, the districts where Republican voters constitute a majority of the electorate are underpopulated. Specifically, Districts 3, 4, and 5, whose residents have generally supported Republicans in recent elections, have population deviations of -4.73%, -1.58% and -3.49%.

125. The improper predominance of partisanship occurred at the expense of the application of traditional redistricting criteria. It was and remains possible to create a district-based plan that faithfully applied traditional redistricting criteria. Yet, Senate Bill 759 subverts those criteria in favor of partisanship: the districts in that plan are less compact and contain larger maximum population deviations, more split precincts, more split political subdivisions, and preserve less of the cores of the prior districts.

126. The improper predominance of geographic favoritism resulted from legislators' desire to strengthen the value of rural votes at the expense of diluting urban votes.

127. This resulted in a systematic overpopulation of the districts in both plans where urban voters constitute a majority of the electorate. Specifically, Districts 1 and 2, whose residents overwhelmingly live in the Town of Boone, have population deviations of 4.85% and 4.96%. In

contrast, the districts in both plans where rural voters constitute a majority of the electorate are underpopulated. Specifically, Districts 3, 4, and 5, whose residents overwhelmingly live outside of the Town of Boone, have population deviations of -4.73%, -1.58% and -3.49%.

128.    The improper predominance of geographic favoritism occurred at the expense of the application of traditional redistricting criteria. The redistricting plans approved by Watauga County voters in 2024 demonstrated that it was possible to create a district-based plan that provided district-based representation to rural voters while faithfully applying traditional redistricting criteria. Yet, Senate Bill 759 subverts those criteria in favor of geographic favoritism: Senate Bill 759 contains larger maximum population deviations, more split precincts, more split political subdivisions, and preserves less of the cores of the prior districts.

129.    The improper predominance of disfavoring college students and other perceived temporary residents resulted from legislators' desire to strengthen the value of supposed permanent residents at the expense of diluting the votes of residents who were perceived to be temporary residents.

130.    This resulted in a systematic overpopulation of the districts in both plans that include the Appalachian State University campus. Specifically, Districts 1 and 2, which include most of the Appalachian State University campus, have population deviations of 4.85% and 4.96%. In contrast, the districts in both plans that include little and/or no parts of the Appalachian State University campus, are underpopulated. Specifically, Districts 3, 4, and 5 have population deviations of -4.73%, -1.58% and -3.49%.

131.    The improper predominance of disfavoring college students occurred at the expense of the application of traditional redistricting criteria. The redistricting plan approved by Watauga County voters in 2024 demonstrated that it was possible to create a district-based plan that provided

district-based representation to voters who do not live in proximity to Appalachian State University while faithfully applying traditional redistricting criteria. Yet, Senate Bill 759 subverts those criteria in favor of geographic favoritism: the districts in this plan contain larger maximum population deviations, more split precincts, more split political subdivisions, and preserve less of the cores of the prior districts.

132. Unless this Court orders Defendants to implement the relief that Plaintiffs so urgently need, the unconstitutional redistricting plans described above will remain in effect for the 2026 election cycle and beyond.

## SECOND CAUSE OF ACTION
### Violation of the Equal Protection Clause
### Disfavored Treatment of Watauga County Voters
### 42 U.S.C. § 1983

133. Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

134. Section 1983 "allows private parties to sue state actors who violate their 'rights' under 'the Constitution and laws' of the United States." *Medina*, 145 S. Ct. at 2227.

135. The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amdt. 14, § 1.

136. "Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance." *Romer v. Evans*, 517 U.S. 620, 633 (1996).

137. "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal

treatment was the result of intentional or purposeful discrimination." *King v. Rubenstein*, 825 F.3d 206, 220 (4th Cir. 2016) (internal quotation marks omitted).

138.    A plaintiff bringing an equal protection claim who makes that showing establishes the equal protection violation upon demonstrating that "the disparity in treatment can[not] be justified under the requisite level of scrutiny." *Id.*

139.    "[A] territorial distinction must rationally serve a legitimate governmental interest." *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 248 F. Supp. 3d 692, 700 (M.D.N.C. 2017).

140.    "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, [courts] ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633.

141.    Even in the absence of a constitutional right to vote by referendum, a state that permits such referenda violates the Equal Protection Clause when it singles out a political subdivision and prevents its residents from exercising referendum rights otherwise available under state law with no rational basis. *City of Greensboro*, 248 F. Supp. 3d at 705 ("The plaintiffs have met their burden of showing that the state had no legitimate governmental interest in prohibiting Greensboro citizens from exercising referendum and initiative rights available to all other municipal citizens, including citizens of other municipalities that have been redistricted and reorganized by the state.").

142.    North Carolina law generally permits county residents to consider and approve referenda that would implement new structures and methods of selecting their boards of county commissioners. N.C. Gen. Stat. §§ 153A-60, 153A-61.

143.    In 2024, Watauga County voters overwhelmingly approved a referendum that would implement new redistricting plans for their county commission for use in the 2026 elections.

144. Senate Bill 912 singles out Watauga County voters—but not residents of other counties—for disfavored treatment because it prohibits any referenda approved by Watauga County voters from taking effect until after the 2032 elections.

145. Because, upon information and belief, North Carolina county commissions with electoral districts implement new redistricting plans after each decennial census, *see* N.C. Gen. Stat. § 153A-22(a), the enactment of new redistricting plans after the 2030 census will moot the maps passed by Watauga County voters in 2024, preventing them from ever taking effect.

146. Senate Bill 912's imposition of disfavored treatment amounts to purposeful and/or intentional discrimination against the residents of Watauga County.

147. No legitimate governmental interest exists that would justify the disfavored treatment of Watauga County residents.

148. Senate Bill 912's treatment of Watauga County residents is an irrational means of furthering any legitimate state interest that could conceivably exist.

<u>**THIRD CAUSE OF ACTION**</u>
**Violation of the First Amendment: Retaliation**
**Referendum Ban**
**42 U.S.C. § 1983**

149. Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

150. Section 1983 "allows private parties to sue state actors who violate their 'rights' under 'the Constitution and laws' of the United States." *Medina*, 145 S. Ct. at 2227.

151. "While citizens do not have a fundamental constitutional right to initiate a referendum, 'if a state chooses to confer the right of referendum to its citizens, it is obligated to do so in a manner consistent with the Constitution.'" *City of Greensboro*, 120 F. Supp. 3d at 487 (quoting *Molinari v. Bloomberg*, 564 F.3d 587, 597 (2d Cir. 2009) (alteration omitted)).

152.     "[U]nder the First Amendment's retaliation prohibition, the government may neither penalize a citizen nor deprive him of a benefit because of his constitutionally protected speech and conduct." *Shapiro v. McManus*, 203 F. Supp. 3d 579, 595–96 (D. Md. 2016) (three-judge panel), *abrogated on other grounds by Rucho v. Common Cause*, 588 U.S. 684 (2019).

153.     "A plaintiff bringing a garden variety retaliation claim under the First Amendment must prove that the responsible official or officials were motivated by a desire to retaliate against him because of his speech or other conduct protected by the First Amendment and that their retaliatory animus caused the plaintiff's injury." *Id.* at 596.

154.     The First Amendment protects the "right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

155.     A plaintiff who "adequately alleges the three elements of intent, injury, and causation . . . states a plausible claim that" challenged state action "violates the First Amendment" prohibition on retaliation unless the state action "was narrowly tailored to achieve a compelling government interest." *Shapiro*, 203 F. Supp. 3d at 597 (three-judge panel).

156.     The General Assembly's passage of Senate Bill 912, Sec. 2 was motivated by an intent to punish plaintiffs for publicly expressing their opposition to Senate Bill 759 and/or associating with other Watauga County voters for the purpose of organizing support for the 2024 referendum.

157.     Senate Bill 912, Sec. 2 injured the First Amendment rights of Plaintiffs and other Watauga County to cast their votes effectively by providing that no referendum to change the structure of the County Commission, even if approved by Watauga County voters, can take effect until after the 2032 elections. *See Williams*, 393 U.S. at 30.

32

158.    The General Assembly would not have passed Senate Bill 912, Sec. 2 but for its motivation to retaliate against Plaintiffs and other Watauga County voters for their support for and advocacy in favor of the 2024 referendum.

159.    No compelling government interest justified the government's passage of Senate Bill 912, Sec. 2, and even if such an interest existed, Senate Bill 912, Sec. 2 is not narrowly tailored to achieve it.

**FOURTH CAUSE OF ACTION**
**Violation of the First Amendment: *Anderson-Burdick***
**Referendum Ban**
**42 U.S.C. § 1983**

160.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

161.    Section 1983 "allows private parties to sue state actors who violate their 'rights' under 'the Constitution and laws' of the United States." *Medina*, 145 S. Ct. at 2227.

162.    "While citizens do not have a fundamental constitutional right to initiate a referendum, 'if a state chooses to confer the right of referendum to its citizens, it is obligated to do so in a manner consistent with the Constitution.'" *City of Greensboro*, 120 F. Supp. 3d at 487 (quoting *Molinari,* 564 F.3d at 597 (alteration omitted)).

163.    The Fourth Circuit has described "the combined *Anderson-Burdick* inquiry" as requiring the following analysis:

> When facing any constitutional challenge to a state's election laws, a court must first determine whether protected rights are severely burdened. If so, strict scrutiny applies. If not, the court must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that order, rather than chaos, is to accompany the democratic processes.

*Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019) (describing the analysis required by *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 434, (1992)) (internal quotation marks omitted).

164.    Senate Bill 912, Sec. 2 imposes a severe burden on Plaintiffs' First and Fourteenth Amendment rights.  *See id.* at 258 ("[T]he *Anderson-Burdick* test provides for the application of strict scrutiny in an appropriate case, that is, when an election regulation severely burdens First and Fourteenth Amendment rights.").  Here, the severe burden amounts to a total denial: Senate Bill 912 makes it impossible for voters' referendum votes to ever take effect.

165.    Specifically, because of Senate Bill 912, Sec. 2, the vote of someone who has supported or would support a referendum imposing new county commission and school board districts cannot be made effective until after the 2032 elections even with the overwhelming support of Watauga County voters.

166.    Upon information and belief, the referendum would not take effect after the 2032 elections because new plans will be implemented based on updated Census data before the 2034 elections.

167.    No sufficient governmental interest justifies the government's challenged conduct. *See id.* ("[T]he *Anderson-Burdick* test provides for the application of strict scrutiny in an appropriate case, that is, when an election regulation severely burdens First and Fourteenth Amendment rights.").

Even if a sufficient governmental interest exists, Senate Bill 912 Sec. 2 is neither adequately tailored to nor the least restrictive means of serving that interest.

34

## FIFTH CAUSE OF ACTION
### Violation of the First Amendment: Viewpoint Discrimination
### Referendum Ban
### 42 U.S.C. § 1983

168.     Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

169.     Section 1983 "allows private parties to sue state actors who violate their 'rights' under 'the Constitution and laws' of the United States." *Medina*, 145 S. Ct. at 2227.

170.     "While citizens do not have a fundamental constitutional right to initiate a referendum, 'if a state chooses to confer the right of referendum to its citizens, it is obligated to do so in a manner consistent with the Constitution.'" *City of Greensboro*, 120 F. Supp. 3d at 487 (quoting *Molinari,* 564 F.3d at 597 (alteration omitted)).

171.     The First Amendment protects the "right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams*, 393 U.S. at 30.

172.     Senate Bill 912, Sec. 2 infringes on the First Amendment right to cast a vote effectively for voters with only one viewpoint – those who supported the 2024 referendum and/or would support similar referenda in the future.

173.     Because of Senate Bill 912, Sec. 2, the vote of someone who has supported or would support a referendum imposing new county commission and school board districts cannot be made effective until after 2032 elections even with the overwhelming support of Watauga County voters, whereas the vote of someone who opposes such a referenda is effective immediately with the support of a bare majority of Watauga County voters.

174.     Senate Bill 912, Sec. 2 thus forces voters who have supported or would support such referenda to cast votes that are necessarily less effective and less valuable than the votes of those who have opposed or would oppose such referenda. *See Shapiro*, 203 F. Supp. 3d at 595 (three-

35

judge panel) ("[T]he devaluation of a citizen's vote by dilution implicates the representational right protected by the First Amendment.").

175. Senate Bill 912, Sec. 2 thus amounts to impermissible viewpoint discrimination. *See generally Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is . . . an egregious form of content discrimination.").

176. No sufficient governmental interest justifies the government's challenged conduct. *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 616 (4th Cir. 2002) ("Where the Government imposes viewpoint-based restrictions, we evaluate the restrictions pursuant to strict scrutiny.").

177. Even if a sufficient governmental interest exists, Senate Bill 912 Sec. 2 is neither adequately tailored to nor the least restrictive means of serving that interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Award preliminary and permanent injunctive relief enjoining Defendants and their agents, officers, and employees from enforcing, implementing, or giving any effect to the reapportionment plans described in Senate Bill 759, Sec. 1 and Senate Bill 912, Sec. 1 in their entirety;

b. Award preliminary and permanent injunctive relief enjoining Defendants and their agents, officers, and employees from enforcing, implementing, or giving any effect to the referendum ban described in Senate Bill 912, Sec. 2 in its entirety;

c. Declare that the reapportionment plans described in Senate Bill 759, Sec. 1 and Senate Bill 912, Sec. 1 are unconstitutional because each violates the First and Fourteenth Amendments;

36

d. Declare that Senate Bill 912, Sec. 2 is unconstitutional because it violates the First and Fourteenth Amendments;

e. Restore, for purposes of holding elections for the Watauga County Commission , the reapportionment plans approved by Watauga County voters in 2024;

f. Make all further orders as are just, necessary, and proper to preserve Citizen Plaintiffs' rights to participate equally in elections for the Watauga County Commission and School Board and to be equally represented by members of the County Commission and School Board;

g. Award Plaintiffs their costs, disbursement, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988;

h. Tax the costs of this action against Defendants; and

i. Grant such other or further relief the Court deems appropriate.

This the 1st day of October, 2025.

<div style="margin-left:40%">

BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, L.L.P.

/s/ Eric F. Fletcher
Eric F. Fletcher
N.C. State Bar No. 54105
efletcher@brookspierce.com
Michael B. Jones
N.C. State Bar No. 63595
mjones@brookspierce.com
Pearson G. Cost
N.C. State Bar No. 60828
pcost@brookspierce.com
Post Office Box 26000
Greensboro, North Carolina 27420
Telephone: (336) 373-8850
Facsimile: (336) 378-1001

*Attorneys for Plaintiffs*

</div>