**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Statesville Division**

| | | |
|---|---|---|
| WATAUGA COUNTY VOTING RIGHTS TASK FORCE, COMMON CAUSE, DR. RAY RUSSELL, LARRY TURNBOW, CHARLIE WALLIN, DR. JAMES FENWICK, JR., LAURIE FLEMING, PATRICIA DALE, and KINNEY RAY BAUGHMAN, | ) | |
| Plaintiffs, | ) | **Case No. 5:25-cv-00157** |
| v. | ) | |
| WATAUGA COUNTY BOARD OF ELECTIONS, ERIC ELLER in his official capacity as a member of the Watauga County Board of Elections, TERRY CIRONE in his official capacity as a member of the Watauga County Board of Elections, PAMELA HUSS CLINE in her official capacity as a member of the Watauga County Board of Elections, ELAINE ROTHENBERG in her official capacity as a member of the Watauga County Board of Elections,, and LETA COUNCILL in her official capacity as a member of the Watauga County Board of Elections, | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


NATURE OF THE MATTER BEFORE THE COURT ........ 1

STATEMENT OF THE FACTS ........ 2

QUESTION PRESENTED ........ 6

ARGUMENT ........ 7

I. STANDARD OF REVIEW ........ 7

II. THIS COURT HAS SUBJECT MATTER JURISDICTION ........ 7

III. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF ALL CLAIMS ........ 8

A. Senate Bill 759 and Senate Bill 912 violate the Equal Protection Clause because the General Assembly-drawn districts are malapportioned. ........ 8

B. The SB912 referendum ban violates the Equal Protection Clause by disfavoring Watauga County voters. ........ 16

C. The referendum ban is unconstitutional First Amendment retaliation. ........ 18

D. The referendum ban is a restriction on voting rights that violates the *Anderson-Burdick* test. ........ 20

E. The referendum ban violates the First Amendment as unconstitutional viewpoint discrimination. ........ 21

IV. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT PRELIMINARILY ENJOIN SENATE BILL 759 AND SENATE BILL 912 ........ 23

V. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR GRANTING THIS MOTION ........ 23

CONCLUSION ........ 24

## TABLE OF AUTHORITIES

Page(s)

Cases

*Abate v. Mundt*,
403 U.S. 182 (1971) ..... 10
*Anderson v. Celebrezze*,
460 U.S. 780 (1983) ..... 20
*Angle v. Miller*,
673 F.3d 1122 (9th Cir. 2012) ..... 20
*Ass'n of Am. Railroads v. Hudson*,
144 F.4th 582 (4th Cir. 2025) ..... 7
*Avery v. Midland County*,
390 U.S. 474 (1968) ..... 9
*Baten v. McMaster*,
967 F.3d 345 (4th Cir. 2020) ..... 7
*Burdick v. Takushi*,
504 U.S. 428 (1992) ..... 20
*City of Greensboro v. Guilford Cnty. Bd. of Elections*,
248 F. Supp. 3d (M.D.N.C. 2017) ..... 16, 17, 18
*Davis v. Mann*,
377 U.S. 678 (1964) ..... 10, 14
*Evenwel v. Abbott*,
578 U.S. 54 (2016) ..... 9
*Fusaro v. Cogan*,
930 F.3d 241 (4th Cir. 2019) ..... 20, 21
*Gonzalez v. Trevino*,
602 U.S. 653 (2024) ..... 19
*Kirkpatrick v. Preisler*,
394 U.S. 526 (1969) ..... 13, 14
*Larios v. Cox*,
300 F. Supp. 2d 1320 (N.D. Ga.) ..... passim
*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ..... 23
*Mazo v. New Jersey Sec'y of State*,
54 F.4th 124 (3d Cir. 2022) ..... 20
*McCutcheon v. Fed. Election Comm'n*,
134 S. Ct. 1434 (2014) ..... 24
*Molinari v. Bloomberg*,
564 F.3d 587 (2009) ..... 17
*Mt. Healthy City Bd. of Ed. v. Doyle*,
429 U.S. 274 (1977) ..... 19
*NAACP-Greensboro Branch v. Guilford Cty. Bd. of Elections*,
858 F. Supp. 2d 516 (M.D.N.C. 2012) ..... 23, 24
*Nken v. Holder*,
556 U.S. 418 (2009) ..... 23

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012) .......... 23
*Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*,
827 F.3d 333 (4th Cir. 2016) .......... 9, 12, 13
*Republican Party of N.C. v. Hunt*,
841 F. Supp. 722 (E.D.N.C. 1994) .......... 23
*Reynolds v. Sims*,
377 U.S. 533 (1964) .......... 9, 10
*Romer v. Evans*,
517 U.S. 620 (1996) .......... 16, 17
*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995) .......... 22
*Rucho v. Common Cause*,
588 U.S. 684 (2019) .......... 13, 18
*Shapiro v. McManus*,
203 F. Supp. 3d 579 (D. Md. 2016) .......... 18, 19, 22
*Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Virginia Dep't of Motor Vehicles*,
288 F.3d 610 (4th Cir. 2002) .......... 22
*Symm v. United States*,
439 U.S. 1105 (1979) .......... 14
*Texas v. Johnson*,
491 U.S. 397 (1989) .......... 21
*Velazquez v. Legal Servs. Corp.*,
164 F.3d 757 (2d Cir. 1999) .......... 22
*Wesberry v. Sanders*,
376 U.S. 1 (1964) .......... 24
*Williams v. Rhodes*,
393 U.S. 23 (1968) .......... 18, 19
*Williams v. Salerno*,
792 F.2d 323 (2d Cir.1986) .......... 23
*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) .......... 7
*Wright v. North Carolina*,
787 F.3d 256 (4th Cir. 2015) .......... 8

Statutes

N.C. Gen. Stat. §§ 115C-37(i), 153A-22(a) .......... 5
N.C. Gen. Stat. §§ 153A-58-61 .......... 17

Other Authorities

N.C. Sess. Laws 2023-147, Senate Bill 759 .......... passim
N.C. Sess. Laws 2024-13, Senate Bill 912 .......... passim

## NATURE OF THE MATTER BEFORE THE COURT

In 2023, the North Carolina General Assembly enacted Senate Bill 759, which imposed five malapportioned electoral districts (the "SB759 districts") for the Watauga County Commission. Recognizing that the General Assembly's plan was unpopular, the County Commission used the statutory process available to all North Carolina counties to call a fall 2024 referendum on a new plan for selecting the County Commission. The General Assembly responded days later by enacting a second bill, Senate Bill 912, which mandated that elections for the Watauga County Board of Education must use the SB759 districts used to elect members of the County Commission. Senate Bill 912 also barred the County Commission's referendum from going into effect, even if approved by the voters. Accordingly, although the voters of Watauga County soon approved the County Commission's plan by a 71-29 margin in the 2024 General Election, that plan will not be in effect for the 2026 elections or beyond. Without this Court's intervention, the voters of Watauga County will, against their clearly expressed will, be forced to use the legislature's unconstitutional maps to elect members of the County Commission and Board of Education in 2026.

The present Motion for Preliminary Injunction requests that the Court act now to preliminarily enjoin the unconstitutional plans mandated by Senate Bill 759 and Senate Bill 912 because maintaining the malapportioned districts and referendum ban throughout this litigation will irreparably harm the voters of Watauga County, including Plaintiffs, in the 2026 election and beyond. Though the General Election is more than a year away, candidate filing for the County Commission and the Board of Education begins on December 1, 2025. Accordingly, this Court's timely intervention is necessary to provide certainty to candidates, which will ensure that the 2026 elections proceed smoothly and constitutionally.

## STATEMENT OF THE FACTS

*The Enactment of Senate Bill 759*

Senate Bill 759 was introduced on October 18, 2023, and enacted by the North Carolina General Assembly one week later, after passing the North Carolina House and Senate on party line votes. N.C. Sess. Laws 2023-147, Senate Bill 759, attached to Fletcher Decl. as Exhibit 13 (hereinafter Senate Bill 759 or SB759). All Republicans present voted in favor of the legislation, and all Democrats present voted against it.[1] The law established five single-member electoral districts for the County Commission, with one member elected from each district, and each member required to reside in the district from which they were elected. *Id.;* see Esselstyn Rep. fig. 6, attached to Fletcher Decl. as Exhibit 1 (and attachments thereto, as Exhibits 2 – 12) (hereinafter Esselstyn Rep.).

*Senate Bill 759's Malapportioned Districts*

As shown in the table below, the SB759 districts have significant population deviations, with district populations ranging between 10,305 residents in District 3 to 11,354 residents in District 1.

**Table 1: Population statistics for districts in the Senate Bill 759 Plan**

| District | Population | Deviation (persons) | Deviation (%) |
|---|---|---|---|
| 1 | 11,342 | 525 | 4.85% |
| 2 | 11,354 | 537 | 4.96% |
| 3 | 10,305 | -512 | -4.73% |
| 4 | 10,646 | -171 | -1.58% |

[1] *See* House Roll Call Vote Transcript for Roll Call #611, North Carolina General Assembly, https://www.ncleg.gov/Legislation/Votes/RollCallVoteTranscript/2023/H/611 (last accessed Oct. 7, 2025); Senate Roll Call Vote Transcript for Roll Call #487, North Carolina General Assembly, https://www.ncleg.gov/Legislation/Votes/RollCallVoteTranscript/2023/S/487 (last accessed Oct. 7, 2025).

| | | | |
|---|---|---|---|
| 5 | 10,439 | -378 | -3.49% |

Esselstyn Rep. ¶ 49 & tbl. 1. The total deviation from the largest district to smallest district is 9.7%. *Id.* ¶ 96 & tbl. 6. The significant population deviations in the SB759 districts cannot be explained by the predominance of traditional redistricting criteria like compactness, preserving political subdivisions, or avoiding unnecessary splits of communities of interest.

To determine whether these criteria predominated in the design of the Senate Bill 759 Plan, Plaintiffs' expert, Blake Esselstyn, "created an illustrative five-district plan" with significantly smaller population deviations than the Senate Bill 759 Plan. *Id.* ¶ 95. The overall population deviation between the districts in the illustrative plan is only 3.43%. *Id.* ¶ 96 & tbl. 6, fig. 17.

Even with its smaller deviations, the illustrative plan outperforms the SB759 districts according to several traditional redistricting criteria. First, the illustrative plan outperforms the SB759 districts on all summary measures for district compactness. *Id.* ¶¶ 116-18. Second, the illustrative plan minimizes political subdivision splits. The illustrative plan divides only one precinct, whereas the SB759 districts divide two. *Id.* ¶¶ 100-03. Moreover, the precinct splits were not designed to achieve population equality. For example, if District 1 incorporated only the three central Boone precincts, its population would be -1.11% below the ideal, but the SB759 districts unnecessarily added blocks from another precinct to increase District 1's population to +4.85% above the ideal. *Id.* ¶ 53. As another example, the New River 2 precinct is unnecessarily split between two districts in four separate places, known as "traversals," which cannot be explained except by an intention to overload the population of District 2. *Id.* ¶¶ 56-58 & fig. 9. Another precinct, Brushy Fork, is split into three separate districts. *Id.* ¶ 60 & fig. 11. Third, the illustrative plan does a better job of avoiding unnecessary splits of communities of interest. For

example, the illustrative plan divides the Town of Boone into three districts, whereas the SB759 districts divide it across all five. *Id.* ¶ 104 & fig. 20.

The population deviations in the SB759 districts can be explained only by illegitimate factors, namely an effort to disfavor urban voters, college students, and voters who prefer Democratic candidates. *Id.* ¶¶ 176, 181. The SB759 districts systematically overpopulate districts (Districts 1 and 2) that are disproportionately comprised of urban, Democratic, and student voters, and it systematically underpopulates districts (Districts 3, 4, and 5) that are disproportionately comprised of rural, Republican, and non-student voters. *Id.* ¶¶ 141, 145, 152. Because the votes of citizens in districts with higher populations are worth proportionally less than the votes of citizens in districts with lower populations, the SB759 districts' overpopulation of Districts 1 and 2 dilutes the voting strength of urban, Democratic, and student voters in those districts. *Id.* ¶ 174.

*The County Commission's Response*

On June 18, 2024, the Commission adopted a resolution pursuant to North Carolina General Statute § 153A-60, which would submit a referendum to the voters of Watauga County to adopt a different plan for selecting the County Commission than that enacted in Senate Bill 759. Minutes, Watauga County Board of Commissioners, https://www.wataugacounty.org/App_Pages/Dept/BOC/viewminutes.aspx?id=1056 (last accessed Oct. 7, 2025). The resolution adopted by the Commission, if approved by county voters, would create three electoral districts and two county-wide at-large seats. *Id.* The districts proposed in the referendum had minimal population deviations, with a total deviation from smallest to largest district of only 3.43%. Esselstyn Rep. ¶ 125 & tbl. 10. No precincts were split in the districts adopted by the County Commission and proposed to the voters by referendum. *Id.* ¶ 127.

After it was adopted by the County Commission in June 2024, the referendum was set to be on the November 2024 General Election ballot presented to all Watauga County voters. *Id.* ¶ 38.

*The General Assembly Enacts Senate Bill 912*

Just nine days after the Watauga County Commission approved the resolution, the General Assembly enacted Senate Bill 912. N.C. Sess. Laws 2024-13, Senate Bill 912, attached to Fletcher Decl. as Exhibit 14 (hereinafter Senate Bill 912 or SB912). Section 1 of Senate Bill 912 mandated that, starting in 2026, the members of the Watauga County Board of Education would be elected from the same five malapportioned County Commission districts enacted in Senate Bill 759. SB912, Sec 1.

Section 2 of Senate Bill 912 was designed to nullify the potential impact of the county-wide referendum on the method of electing the County Commission, which was scheduled to take place in November 2024. Section 2 provides that even "[i]f a majority of the voters of Watauga County vote for any referendum conducted under Part 4 of Article 4 of Chapter 153A, … the alteration approved in that referendum shall take effect the first Monday in December following the 2032 general election." SB912, Sec. 2. In other words, Section 2 provided that even if the November 2024 referendum was adopted by a majority of Watauga County voters, the plan adopted would not take effect until the 2034 general election.

Because the plan proposed in the November 2024 referendum included three electoral districts, the County Commission would be required to draw new districts by 2034 to take into account population changes identified in the 2030 census. *See* N.C. Gen. Stat. §§ 115C-37(i), 153A-22(a). In effect, Section 2 of Senate Bill 912 ensured that no referendum plan adopted between 2024 and 2030 would ever take effect.

*Watauga County Voters Overwhelmingly Reject the General Assembly's Districts in the 2024 General Election*

In the 2024 General Election, the voters of Watauga County overwhelmingly approved the referendum proposed by the County Commission to establish a system with three electoral districts and two at-large seats. In the final tally, more than 71 percent of Watauga County voters supported the measure, while only 29 percent of the county's voters opposed the measure. Esselstyn Rep. ¶ 44. Demonstrating the measure's widespread support, a majority of voters in each precinct of Watauga County voted in favor of the measure. *Id.*

Despite its widespread support among county voters, the measure will never take effect and the SB759 districts imposed by the General Assembly will continue to be used in Watauga County because of Senate Bill 912.

## QUESTION PRESENTED

Should Defendants be enjoined from: (i) holding elections for the Watauga County Board of Commissioners and the Watauga County Board of Education under the electoral districts imposed by Senate Bill 759 and Senate Bill 912; or (ii) enforcing Section 2 of Senate Bill 912's nullification of Watauga County's 2024 referendum that altered the structure of the Watauga County Board of Commissioners?

## ARGUMENT

### I. Standard of Review

Under Rule 65 of the Federal Rules of Civil Procedure, the requirements for granting preliminary injunctive relief are well settled: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

### II. This Court has subject matter jurisdiction.

Plaintiffs have standing to bring this action. "They were required to allege (1) that they suffered a concrete and particularized injury in fact that was more than merely hypothetical or conjectural; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely that the injury will be redressed by a favorable decision." *Baten v. McMaster*, 967 F.3d 345, 352 (4th Cir. 2020), *as amended* (July 27, 2020) (quotations omitted). Here, the individual plaintiffs, residents of unconstitutionally malapportioned districts, have alleged and demonstrated that they have suffered personalized injuries that are traceable to Defendants' implementation of the challenged laws, and redressable with an injunction. Baughman Aff.; Dale Aff.; Fenwick Aff.; Fleming Aff.; Russell Aff.; Turnbow Aff.; Wallin Aff.[2] They therefore have standing. Similarly, the organizational plaintiffs have demonstrated that they each have standing based on the membership of at least one individual who would have standing to sue in their own right. *See Ass'n of Am. Railroads v. Hudson*, 144 F.4th 582, 589 (4th Cir. 2025) ("identif[ying] the three-pronged standard that governs . . . claim[s] [for] representational standing"); Common

---

[2] The foregoing affidavits are attached to Fletcher Decl. as Exhibits 18 - 24.

Cause Aff.; Task Force Aff.[3] Moreover, Plaintiffs' claims are not only ripe but urgent – the 2026 election season is rapidly approaching.

## III. Plaintiffs are likely to succeed on the merits of all claims.

Plaintiffs will likely prevail on the merits of their claims that: (a) the General Assembly-drawn districts violate the Equal Protection Clause because they are malapportioned, (b) the referendum ban violates the Equal Protection Clause by disfavoring Watauga County voters, (c) the referendum ban violates the First Amendment because it amounts to unconstitutional retaliation, (d) the referendum ban violates the *Anderson-Burdick* test, and (e) the referendum ban is unconstitutional viewpoint discrimination.

### A. Senate Bill 759 and Senate Bill 912 violate the Equal Protection Clause because the General Assembly-drawn districts are malapportioned.

Senate Bill 759 and Senate Bill 912 violate the Equal Protection Clause because they establish malapportioned electoral districts for the County Commission and Board of Education that dilute Plaintiffs' votes. Urban, Democratic voters, and students at Appalachian State University, are systematically overrepresented in two overpopulated districts with significant population deviations. The remaining three districts are systematically underpopulated and are designed to give disproportionately strong voices to rural voters, Republican voters, and non-students.

These features demonstrate that the SB759 districts are unconstitutional. "Inherent in the equal protection of voting is the requirement that all citizens' votes be weighted equally, a principle that is commonly known as one person, one vote." *Wright v. North Carolina*, 787 F.3d 256, 264 (4th Cir. 2015). "This requirement that all citizens' votes be weighted equally, known as the one

---

[3] The foregoing affidavits are attached to Fletcher Decl. as Exhibits 16 - 17.

person, one vote principle, applies not just to the federal government but also to state and local governments—including school boards and county governing bodies." *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016); *see Avery v. Midland County*, 390 U.S. 474, 4780 (1968) ("[W]hen the State delegates lawmaking power to local government and provides for the election of local officials from districts specified by statute, ordinance, or local charter, it must insure that those qualified to vote have the right to an equally effective voice in the election process."); *see also Evenwel v. Abbott*, 578 U.S. 54, 71 (2016) ("States and localities may comply with the one-person, one-vote principle by designing districts with equal total populations.").

"[W]hen drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness." *Evenwel*, 578 U.S. at 59. "But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify dispar[i]ties from population-based representation." *Reynolds v. Sims*, 377 U.S. 533, 579–80 (1964) (footnote omitted). No matter what, a population deviation cannot withstand constitutional scrutiny if it is "tainted by arbitrariness or discrimination." *Larios v. Cox*, 300 F. Supp. 2d 1320, 1338 (N.D. Ga.) (three-judge panel), *aff'd*, 542 U.S. 947 (2004); *see also Reynolds*, 377 U.S. at 579. To succeed, "plaintiffs in one person, one vote cases with population deviations below 10% must show by a preponderance of the evidence that improper considerations predominate in explaining the deviations." *Raleigh Wake Citizens Ass'n*, 827 F.3d at 342.

Here, the SB759 districts have large population deviations, ranging from 10,305 residents in District 3 to 11,354 residents in District 1, which means that the total deviation from the largest

district to smallest district is 9.7%. Esselstyn Rep. ¶ 96 & tbl. 6. This is just shy of the 10% threshold that would "create[ ] a prima facie case of discrimination" and shift the burden of persuasion onto the Defendants to justify their apparent constitutional violation. *See Larios*, 300 F. Supp. 2d at 1340.

No traditional redistricting criteria account for the large deviations in the SB759 districts. As explained above, the illustrative plan has much smaller population deviations, scores better on compactness, has fewer precinct and political subdivision splits, and better preserves the integrity of communities of interest. *See supra* p. 3.

In contrast to the absence of these traditional redistricting criteria, at least three improper considerations systematically predominated in the design of each district in the plan: geographic favoritism, partisan advantage, and an effort to disfavor college students.

*i. Geographic Favoritism*

Legislators drew the SB759 districts to favor rural voters at the expense of urban voters in Watauga County. This is clear from the maps themselves, as well as comments from the legislation's primary sponsor.

Favoring a certain geographic region is an improper consideration in redistricting and evidences the sort of discrimination prohibited by the Equal Protection Clause. *See Reynolds*, 377 U.S. at 567-68 ("The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote . . . A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm."); *Abate v. Mundt*, 403 U.S. 182, 185-86 (1971) ("[W]e have underscored the danger of apportionment structures that contain a built-in bias tending to favor particular geographic areas . . ."); *Davis v. Mann,* 377 U.S. 678, 692 (1964) (rejecting the argument that a deviation was "sustainable as involving an attempt to balance

urban and rural power in the legislature"); *Larios*, 300 F. Supp. 2d at 1342 ("The House and Senate Plans must be struck down on this basis alone, because the Supreme Court has long and repeatedly held that favoring certain geographic regions of a state over other regions is unconstitutional.").

For example, in *Larios*, the district court struck down a redistricting plan where the record made "abundantly clear that the population deviations," although less than ten percent, "were not driven by any traditional redistricting criteria" but instead reflected a "concerted effort to allow rural and inner-city Atlanta regions of the state to hold on to their legislative influence," which suggested a "taint of arbitrariness or discrimination." 300 F. Supp. 2d at 1341-42.

Here, the primary sponsor of Senate Bill 759 and Senate Bill 912 justified Senate Bill 759 as motivated by "the predominance of the university and others in the electoral process." Hearing on S 759 Before the H. Committee on Redistricting, N.C. Gen. Assembly (October 24, 2023), attached to Fletcher Decl. as Exhibit 25. He further attributed the shift to electoral districts to "a small geographic area [being] so dominant that they don't have representation in the outer parts of the county." *Id.* Later, the primary sponsor explained that Senate Bill 759 was motivated by feedback that county elections "are dominated by a state university that [exists] in the middle of the county," which leads to "a lot of county residents that feel that they are never represented on their County Commission." Hearing on Senate Bill 912 Before the S. Committee on Redistricting and Elections, N.C. Gen. Assembly (June 12, 2024), attached to Fletcher Decl. as Exhibit 25.

Reflecting this geographic favoritism, the SB759 districts systematically overpopulate the districts in which urban voters have the opportunity to elect their candidates of choice and systematically underpopulates the districts in which rural voters have the opportunity to elect their candidates of choice. The overpopulated districts (Districts 1 and 2) are mostly comprised of urban residents, and the underpopulated districts (Districts 3, 4, and 5) are mostly comprised of rural

residents. Esselstyn Rep. ¶¶ 135-40. Specifically, Districts 1 and 2, whose residents overwhelmingly live in the Town of Boone, have population deviations of 4.85% and 4.96%. *Id.* ¶¶ 49-50 & tbl. 1. In contrast, Districts 3, 4, and 5, whose residents overwhelmingly live outside of the Town of Boone, have population deviations of -4.73%, -1.58% and -3.49%. *Id.* Thus, although the precincts containing the Town of Boone are sufficiently populous to be wholly contained within three districts, the majority are instead packed into the two overpopulated districts while voters in the remaining three precincts are split into the three underpopulated districts. *Id.* ¶ 136. This dilutes the votes of urban voters in two different ways: by concentrating them into overpopulated districts and fragmenting the remainder across underpopulated districts. *Id.* ¶¶ 140, 172-80. The illustrative plan contains no such vote dilution, *id.* ¶¶ 100-04 & fig. 20, while at the same time outperforming the SB759 districts according to several traditional redistricting criteria.

Like in *Larios*, both the mapmakers' admissions and resulting districts make "it abundantly clear that regional favoritism substantially drove the population deviations." *See Larios*, 300 F. Supp. 2d at 1342. Therefore, the General Assembly's decision to overpopulate urban districts and underpopulate rural districts predominated the process, and consequently violates the Equal Protection Clause.

*ii. Partisan Advantage*

The General Assembly also had another aim in mind: partisan advantage. The same urban residents whose votes were diluted by the SB759 districts, purportedly to enhance rural residents' voting power, are also disproportionately Democratic voters, and the same rural voters who benefited from the imposition of the SB759 districts are disproportionately Republican voters.

Like favoring a certain geographic region, partisan advantage is an improper redistricting consideration. *Raleigh Wake Citizens Ass'n*, 827 F.3d at 345 (holding that an "intentional effort

to create a significant partisan advantage" is an "illegitimate reapportionment factor" (alteration and quotations omitted)); *Larios*, 300 F. Supp. 2d at 1354. In *Larios*, the three-judge panel held that electoral districts violated the one person, one vote principle when they systematically underpopulated and overpopulated districts on partisan grounds. 300 F. Supp. 2d at 1338. The court concluded that, although "legitimate state concerns may justify slight deviations, 'problems created by partisan politics cannot justify an apportionment which does not otherwise pass constitutional muster."' *Id.* at 1353 (quoting *Kirkpatrick v. Preisler,* 394 U.S. 526, 533 (1969)). The Fourth Circuit has explained that *Larios* is persuasive authority in this Circuit, *Raleigh Wake Citizens Ass'n*, 827 F.3d at 342.[4]

Here, the predominance of partisanship is illustrated by the overvaluation of votes in Republican-majority areas and dilution of votes in Democratic-majority areas.[5] Specifically, Districts 1 and 2, whose residents have generally supported Democrats in recent elections, have population deviations of 4.85% and 4.96%. Esselstyn Rep. ¶ 49 & tbl. 1; *id.* ¶¶ 151-154 & fig. 32. In a cross-section of recent elections, the Democratic vote share in those two districts has been 75.5% and 63.8%, respectively. *Id.* fig. 32, 35. In contrast, in the underpopulated districts where Republican voters constitute a majority of the electorate—Districts 3, 4, and 5—the Democratic

---

[4] Although Defendants may argue that malapportionment claims based on partisanship are no longer viable after the Supreme Court's decision in *Rucho v. Common Cause*, that argument would miss the mark. In *Rucho*, the Supreme Court confirmed that justiciable standards exist to adjudicate one-person, one-vote claims because "the one-person, one-vote rule is relatively easy to administer as a matter of math." *Rucho v. Common Cause*, 588 U.S. 684, 708 (2019).

[5] The Court need not decipher whether the primary goal was geographic favoritism or partisan advantage because, like in *Larios*, "partisan interests are bound up inextricably with the interests of regionalism." *Larios*, 300 F. Supp. at 1352 ("We need not resolve the issue of whether or when partisan advantage alone may justify deviations in population, because here the redistricting plans are plainly unlawful. . . . It is simply not possible to draw out and isolate the political goals in these plans from the plainly unlawful objective of regional protection . . ."). Either criterion, standing alone, is sufficient to find the SB759 districts unconstitutional.

vote share for those same elections is 46.5%, 46.1%, and 45.8%, respectively. *Id.* Thus, despite the fact that since 2020, Democratic candidates have typically won more votes in Watauga County than Republican candidates, Republican candidates are expected to win three of the five seats in the SB759 districts. *Id.* ¶¶ 149-54. Democratic voters suffer from systematic vote dilution under the SB759 districts. *Id.* ¶¶ 172-80. The illustrative plan contains no such vote dilution while outperforming the SB759 districts according to several traditional redistricting criteria. *Id.* ¶¶ 145-48.

Because partisan advantage is an improper consideration in redistricting, the General Assembly's partisan motivations and corresponding district maps violate the Equal Protection Clause.

*iii. Effort to Disfavor College Students*

Like regional favor and partisan advantage, disfavoring a subset of the population because they are perceived to be temporary residents, such as college students, is an improper consideration. *See Symm v. United States*, 439 U.S. 1105 (1979) (affirming three-judge panel decision recognizing that burdening the voting rights of college students can violate the Fourteenth Amendment); *Kirkpatrick*, 394 U.S. at 534–35 (holding that a state that "haphazard[ly]" overpopulated a district because of "the presence in that district of a military base and a university" without demonstrating that the overpopulation was attributable to "noneligible voters" violated the Equal Protection Clause); *Davis*, 377 U.S. at 691 (rejecting the "argument that the underrepresentation of Arlington, Fairfax and Norfolk is constitutionally justifiable since it allegedly resulted in part from the fact that those areas contain large numbers of military and military-related personnel").

In addition to suggesting that Senate Bill 759 was motivated by the dominance of Appalachian State University in Watauga County's elections, the bill's primary sponsor attributed the legislation to the fact that "Watauga County is unique in the concept that in a county of 55,000 people you have a university on a very small footprint of temporary and four-year residents that represent 20,000 individuals in that county," which produces "a lot of . . . complaints about the influence that those temporary residents have in these kind of elections." Hearing on Senate Bill 912 Before the S. Committee on Redistricting and Elections, N.C. Gen. Assembly (June 12, 2024), attached to Fletcher Decl. as Exhibit 25.

The General Assembly's effort to disfavor college students resulted in a systematic overpopulation of the districts in both plans that contain disproportionate shares of Appalachian State University students. Specifically, Districts 1 and 2 have population deviations of 4.85% and 4.96%. Esselstyn Rep. ¶ 49 & tbl. 1. Meanwhile, Districts 3, 4, and 5 have population deviations of -4.73%, -1.58% and -3.49%. *Id.* Districts 1 and 2, the systematically overpopulated districts, are also the districts that contain most Appalachian State University students. *Id.* ¶ 144. Districts 3, 4, and 5, the systematically underpopulated districts, contain "smaller fragments of the student population." *Id.* ¶ 144. Senate Bill 759 thus dilutes the votes of students and other perceived temporary residents by systematically overpopulating the districts that contain most students and systematically underpopulating the districts that contain comparatively few students. *Id.* ¶¶ 172-80. The illustrative plan contains no such vote dilution, *id.* ¶ 155 & fig, 3, while at the same time outperforming the SB759 districts according to several traditional redistricting criteria.

As another improper consideration in redistricting, the General Assembly's motivation in disfavoring college students violates the Equal Protection Clause.

* * * *

The predominance of regional favoritism, partisan advantage, and disfavoring college students occurred at the expense of the application of traditional redistricting criteria. It was and remains possible to create a district-based plan that faithfully applies traditional redistricting criteria. Yet, Senate Bill 759 subverts those criteria in favor of improper considerations.

### B. The SB912 referendum ban violates the Equal Protection Clause by disfavoring Watauga County voters.

Senate Bill 912 violates the Equal Protection Clause because it singles out Watauga County voters—out of all voters in the State—and prevents them alone from adopting referenda to structure their own county commission. While North Carolina's other 99 counties remain free to avail themselves of the statutory process available to change their county commission, Watauga County was singled out for disparate treatment after its Commission had already voted to place a referendum on the ballot. That referendum, which passed with 71% of the vote, will never take effect. "[A] territorial distinction must rationally serve a legitimate governmental interest." *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 248 F. Supp. 3d 692, 700 (M.D.N.C. 2017). "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, [courts] ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer v. Evans*, 517 U.S. 620, 633 (1996).

Even in the absence of a constitutional right to vote by referendum, a state that permits referenda violates the Equal Protection Clause when it singles out a political subdivision and prevents its residents from exercising rights otherwise available under state law with no rational basis. *City of Greensboro*, 248 F. Supp. 3d at 705. In *City of Greensboro*, the Middle District of North Carolina held that the North Carolina General Assembly violated the Equal Protection Clause when it singled out Greensboro residents by revoking their referendum and initiative rights without any identifiable legitimate government purpose. *Id.* Just weeks after the court

preliminarily enjoined the legislation at issue, the General Assembly amended the legislation to restore those rights—but only after the return of the 2020 census—at least 5 years later. *Id.* at 697. The district court held that the amended statute's five-year ban on referenda was still unconstitutional. *Id.* at 705.

In North Carolina, counties have the statutory right to alter the structure of their local government by a resolution from their board of commissioners and a referendum passed by their voters. N.C. Gen. Stat. §§ 153A-58-61. The approved alteration takes effect on the first Monday in December following the general election, and serves as the basis for nominating and electing members of the board of commissioners at the first primary and general election held after the referendum's approval. *Id.* § 153A-62.

The SB912 referendum ban withdraws from Watauga County voters the right granted to all other North Carolina voters in Section 153A-62 to enact timely alterations to the structure of their County Commission. *See* SB912, Sec. 2. The provision treats citizens of Watauga County differently from all other citizens in the state.[6] The targeted withdrawal of this statutory right for Watauga County voters alone, amounts to purposeful and/or intentional discrimination, is not "consistent with the Constitution" and thus cannot survive Equal Protection scrutiny. *See Molinari v. Bloomberg*, 564 F.3d 587, 597 (2009).

Measured against the rational basis standard, the targeted withdrawal of referendum rights from Watauga County citizens violates the Equal Protection Clause. Like in *City of Greensboro*, no rational interest of the State is served by withdrawing the right of self-government by means of

[6] Notably, Senate Bill 759 also created electoral districts for Anson County. SB759. The General Assembly did not, however, enact a provision comparable to the SB912 referendum ban that forbids Anson County voters from changing the structure of their County Commission by referendum. *See Romer*, 517 U.S. at 633.

referendum for one county's residents alone among all North Carolina voters. *See City of Greensboro*, 248 F. Supp. 3d at 705.[7]

**C. The referendum ban is unconstitutional First Amendment retaliation.**

The SB912 referendum ban amounts to unconstitutional retaliation because it was motivated by the General Assembly's decision to retaliate against the Plaintiffs who supported the referendum, and this retaliatory animus injured Plaintiffs. The First Amendment protects the "right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). "[U]nder the First Amendment's retaliation prohibition, the government may neither penalize a citizen nor deprive him of a benefit because of his constitutionally protected speech and conduct." *Shapiro v. McManus*, 203 F. Supp. 3d 579, 595–96 (D. Md. 2016) (three-judge panel), *abrogated on other grounds by Rucho*, 588 U.S. 684. "A plaintiff bringing a garden variety retaliation claim under the First Amendment must prove that the responsible official or officials were motivated by a desire to retaliate against him because of his speech or other conduct protected by the First Amendment and that their retaliatory animus caused the plaintiff's injury." *Shapiro*, 203 F. Supp. 3d at 596.

Courts use a two-step burden-shifting approach to assess retaliation claims under the First Amendment: (1) "the plaintiff must demonstrate that he engaged in protected speech and that his speech was a 'substantial' or 'motivating' factor in the defendant's decision to take action against him"; and (2) if the plaintiff makes this showing, "the burden shifts to the defendant at the second step to show that he would have taken the same adverse action even in the absence of the protected

---

[7] While Defendants may attempt to argue that a rational basis exists for Section 2, they cannot provide a rational, legitimate reason why Watauga County voters *alone* were singled out by Section 2. Moreover, to the extent that Defendants may point to the motivations for drawing the SB912 districts as the rational basis for Section 2, the argument must fail because the purposes driving the imposition of those districts are themselves illegitimate and discriminatory.

speech." *Gonzalez v. Trevino*, 602 U.S. 653, 662-63 (2024) (Alito, J., concurring) (citing *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977)).

Here, Watauga County voters—including Plaintiffs—engaged in protected First Amendment activity when they associated with one another to support, organize, and vote in favor of the 2024 referendum to change the County Commission structure. *See* Minutes, Watauga County Board of Commissioners (June 4, 2024), attached to Fletcher Decl. as Exhibit 15 (including remarks by County Commissioners expressing their opposition to Senate Bill 759). The General Assembly's enactment of the SB912 referendum ban to punish those plaintiffs was clearly motivated by an intent to punish plaintiffs for publicly expressing their opposition to the SB759 districts and associating with other Watauga County voters for the purpose of organizing support for the 2024 referendum. The sponsor of Senate Bill 912 explained the purpose of Section 2—just days after the County Commission adopted its resolution—by stating that "there is a particular need to lock in" the legislative-drawn districts because "some commissioners are not happy and are trying to change the districts over the will of the General Assembly." Hearing on S 912 Before the S. Comm. on Redistricting and Elections, N.C. Gen. Assembly (June 12, 2024), attached to Fletcher Decl. as Exhibit 25. Retaliatory animus plainly drove the adoption of Section 2 and Defendants cannot show that they would have adopted Section 2 in the absence of Plaintiffs' protected conduct.

Ultimately, the enactment of Senate Bill 912 caused two distinct injuries to Plaintiffs. First, it burdened their right to cast their votes effectively by providing that no such referendum approved by Watauga County voters will take effect until after the 2032 elections. *See Williams*, 393 U.S. at 30. Second, it "dilute[d] the value of" their "vote[s] by placing [them] in . . . overpopulated district[s]." *See Shapiro*, 203 F. Supp. 3d at 595 (three-judge panel). Because Senate Bill 912's

referendum ban was motivated by a desire to harm Plaintiffs for protected First Amendment activity and, in fact, caused them constitutional injury, it must be enjoined.

### D. The referendum ban is a restriction on voting rights that violates the *Anderson-Burdick* test.

By nullifying the will of Watauga County voters for over a decade, the SB912 referendum ban's severe burden on voting violates the First Amendment. The First Amendment test set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992), commonly referred to as the *Anderson-Burdick* test, was summarized by the United States Court of Appeals for the Fourth Circuit as follows:

> In short, election laws are usually, but not always, subject to ad hoc balancing. When facing any constitutional challenge to a state's election laws, a court must first determine whether protected rights are severely burdened. If so, strict scrutiny applies. If not, the court must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that 'order, rather than chaos, is to accompany the democratic processes.'

*Fusaro v. Cogan*, 930 F.3d 241, 257-58 (4th Cir. 2019). "The *Anderson-Burdick* test requires the reviewing court to (1) determine the 'character and magnitude' of the burden that the challenged law imposes on constitutional rights, and (2) apply the level of scrutiny corresponding to that burden." *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 137 (3d Cir. 2022) (*citing* Burdick, 504 U.S. at 434). "Courts have applied *Anderson-Burdick* to a wide range of state election laws covering nearly every aspect of the electoral process." *Id.*; *see also id.* at 140-42 (collecting cases in which the Court of Appeals have used the *Anderson-Burdick* test). Indeed, in the context of voter initiatives, one federal court of appeals has explained that "ballot access restrictions place a severe burden on core political speech, and trigger strict scrutiny, when they significantly inhibit the ability of initiative proponents to place initiatives on the ballot." *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012).

The SB912 referendum ban violates the First Amendment because it imposes a severe burden on Watauga County voters by nullifying their will, as expressed in the 2024 General Election, for at least a decade. This harm is not speculative: the voters of Watauga County overwhelmingly voted in favor of a different structure for their County Commission, but those votes have been rendered meaningless by the SB912 referendum ban. While the State may lawfully modify referendum procedures by statute, it cannot do so in a manner that arbitrarily targets one county's electorate for unique and punitive treatment. The severe burden here stems not from the legislature's exercise of authority to amend election laws generally, but from its discriminatory and retaliatory use of that power against Watauga County voters alone.

The targeted nullification imposes a severe burden under *Anderson-Burdick* and requires Defendants to identify a significant government interest that justifies the restriction, and to prove that the restriction is narrowly tailored to that interest. *See Fusaro*, 930 F.3d at 258 ("[T]he Anderson-Burdick test provides for the application of strict scrutiny in an appropriate case, that is, when an election regulation severely burdens First and Fourteenth Amendment rights."). They fail at both steps, and the provision must be struck down.

### E. The referendum ban violates the First Amendment as unconstitutional viewpoint discrimination.

Not only does the SB912 referendum ban single out Watauga County, it discriminates against a specific viewpoint within the County—namely, the position of those that advocate and vote for new county commissioner districts—by eliminating the efficacy of the viewpoint for over a decade. The First Amendment strongly protects the right to criticize government and advocate change in governmental policy. *See Texas v. Johnson*, 491 U.S. 397, 411 (1989) ("[E]xpression of dissatisfaction with the policies of this country [is] situated at the core of our First Amendment values."). Policies that drive certain ideas or viewpoints from the marketplace are unconstitutional

viewpoint discrimination, including policies that "discourage challenges to the status quo." *See Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 769-72 (2d Cir. 1999), *aff'd*, 531 U.S. 533 (2001) (finding a provision that prevented efforts to amend or challenge existing law "inescapably viewpoint-biased").

The SB912 referendum ban infringes on the First Amendment right of voters with only one viewpoint—those who supported the 2024 referendum and would support similar referenda in the future. Due to the referendum ban, the vote of someone who has supported or would support a referendum imposing new county commission districts cannot be made effective until after 2032 elections even with the overwhelming support of Watauga County voters, whereas the vote of someone who opposes such a referendum would be effective immediately with the support of a bare majority of Watauga County voters.

The SB912 referendum ban thus forces voters who have supported or would support such referenda to cast votes that are necessarily ineffective and less valuable than the votes of those who have opposed or would oppose such referenda. *See Shapiro*, 203 F. Supp. 3d at 595 (three-judge panel) ("[T]he devaluation of a citizen's vote by dilution implicates the representational right protected by the First Amendment."). Consequently, the SB912 referendum ban amounts to impermissible viewpoint discrimination. *See generally Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is thus an egregious form of content discrimination.").

No sufficient governmental interest justifies the government's challenged conduct. *See Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Virginia Dep't of Motor Vehicles*, 288 F.3d 610, 616 (4th Cir. 2002) ("Where the Government imposes viewpoint-based restrictions, we evaluate the restrictions pursuant to strict scrutiny."). Even if such an interest exists, the

referendum ban is neither adequately tailored to nor the least restrictive means of serving that interest.

## IV. Plaintiffs will suffer irreparable harm if the Court does not preliminarily enjoin Senate Bill 759 and Senate Bill 912.

Plaintiffs will suffer irreparable harm absent an injunction because Senate Bills 759 and 912 fundamentally burden their voting rights – an injury that "[c]ourts routinely deem . . . irreparable." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir.1986); *NAACP-Greensboro Branch v. Guilford Cty. Bd. of Elections*, 858 F. Supp. 2d 516, 526 (M.D.N.C. 2012); *Republican Party of N.C. v. Hunt*, 841 F. Supp. 722, 728 (E.D.N.C. 1994).

Without this Court's timely intervention, the unconstitutional electoral districts enacted in Senate Bill 759 and Senate Bill 912 will remain in effect for the 2026 election cycle. Moreover, "[o]nce the election occurs, there can be no do-over and no redress." *League of Women Voters of N. Carolina*, 769 F.3d at 247. "The injury to these voters is real and completely irreparable if nothing is done to enjoin this law." *Id.* (footnote omitted). Thus, absent preliminary injunctive relief, the destructive scheme of Senate Bill 759 and Senate Bill 912 will irreparably harm Plaintiffs and other Watauga County voters in the 2026 elections.

## V. The balance of equities and the public interest favor granting this Motion.

The final two factors, the balance of the equities and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), overwhelmingly favor Plaintiffs. While plaintiffs will suffer severe and irreparable harm if the challenged provisions are allowed to remain in effect, *see supra*, the burden of reverting to the prior electoral system or implementing the Referendum Plan will be minimal. If Watauga County

reverts to the prior electoral system for County Commission, School Board, or both entities, ballots are cast county-wide. Candidates simply must ensure that they reside in the proper district. If Watauga County implements the referendum overwhelmingly approved by the voters for the County Commission, then implementing that plan would impose a minimal burden on Defendants because it contains only three electoral districts and no precinct splits. *See* Esselstyn Rep. ¶ 127.

Issuing the requested preliminary injunction is in the public interest because the public has a significant interest in preventing the right to vote from being denied or abridged. *See NAACP-Greensboro Branch*, 858 F. Supp. 2d at 529 ("[T]he public interest in an election . . . that complies with the constitutional requirements of the Equal Protection Clause is served by granting a preliminary injunction."); *see generally McCutcheon v. Fed. Election Comm'n,* 134 S. Ct. 1434, 1440-41 (2014); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Here, Senate Bill 759 and Senate Bill 912 abridge the votes of citizens in Districts 1 and 2 and deny the entire County's right to an effective referendum process.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction enjoining Senate Bill 759 and Senate Bill 912 for the 2026 elections, and ensuring that the 2026 elections are conducted in a constitutional manner.

This the 3rd day of November, 2025.


BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, L.L.P.

/s/ Eric F. Fletcher
Eric F. Fletcher
N.C. State Bar No. 54105
efletcher@brookspierce.com
Michael B. Jones
N.C. State Bar No. 63595
mjones@brookspierce.com
Pearson G. Cost
N.C. State Bar No. 60828
pcost@brookspierce.com
Post Office Box 1800
Raleigh, North Carolina 27602
Telephone: (919) 839-0300
Facsimile: (919) 839-0304

*Attorneys for Plaintiffs*

**CERTIFICATION IN COMPLIANCE WITH STANDING ORDER REGARDING USE OF ARTIFICIAL INTELLIGENCE**

I hereby certify that (a) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg, and (b) every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 3rd day of November, 2025.

/s/ Eric F. Fletcher
Eric F. Fletcher

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing has been served on all parties to this action by filing the same in the Court's Case Management/Electronic Case Filing System, which will send a Notice of Electronic Filing to all counsel of record for the parties.

This the 3rd day of November, 2025.

/s/ Eric F. Fletcher
Eric F. Fletcher