IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Statesville Division
Case No. 5:25-cv-00157

| | |
|---|---|
| WATAUGA COUNTY VOTING RIGHTS TASK FORCE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> WATAUGA COUNTY BOARD OF ELECTIONS, et al, <br><br> Defendants. <br> and <br><br> PHILIP E. BERGER, et al., <br><br> Intervenor-Defendants. | **PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

## INTRODUCTION

The key facts are not in dispute. The five electoral districts drawn by the General Assembly that now apply to the Watauga County Board of Commissioners and Board of Education have significant population deviations that give greater weight to certain voters than others. Legislative Defendants concede that these districts were drawn to dilute a perceived "dominance of university/Boone interests over all other county interests" (DE 38 at 2) and that "partisanship was clearly a factor in the drawing" (DE 38 at 3). These concessions mirror the allegations in Plaintiffs' Complaint. Defendants likewise concede that the voters of Watauga County voted in 2024 to change the structure for the Board of Commissioners and that the change has been effectively nullified by Senate Bill 912.

The only questions that remain are legal—and they are easily answered. Plaintiffs do not bring partisan gerrymandering claims. Plaintiffs challenge the undisputed population deviations

between the districts, which deny "every voter, no matter what district he or she lives in, . . . an equal say in electing a representative," in a claim that has been recognized by the United States Supreme Court for more than 60 years. *Wright v. North Carolina*, 787 F.3d 256, 264 (4th Cir. 2015) (citing *Daly v. Hunt*, 93 F.3d 1212, 1216 (4th Cir. 1996)); *see also Reynolds v. Sims*, 377 U.S. 533, 563 (1964). No court has held that map drawers may dilute or strengthen votes to achieve partisan aims.

Defendants' assertion that *Rucho v. Common* Cause, 588 U.S. 684 (2019) somehow bars Plaintiffs' claims about the referendum ban are similarly misguided. State law affords a referendum right to all North Carolina counties except Watauga County. Legislative Defendants assert that "the General Assembly has not delegated its role as the primary redistricting authority to the counties," but they have in N.C. Gen. Stat. §§ 153A-58 *et seq*. Having made that delegation to counties, the Equal Protection Clause prohibits the General Assembly from singling out voters in specific, disfavored jurisdictions for unequal treatment. *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 248 F. Supp. 3d 692, 702-05 (M.D.N.C. 2017). Defendants offer no meaningful response to Plaintiffs' First Amendment claims, which clearly identify the ways in which the referendum ban—enacted to nullify "yes" votes after the referendum had been adopted by the Board of Commissioners—burdens Plaintiffs' First Amendment rights.

Finally, Defendants seek refuge in *Purcell v. Gonalez*, 549 U.S. 1 (2006). But the proper application of *Purcell* turns on the nature of the relief being sought. Defendants' reliance on the Supreme Court's recent applications of *Purcell* in the context of Congressional elections is misplaced because the administration of a Congressional election is far more complex than the administration of local elections like those at issue in this case. The Fourth Circuit's binding decision in *Raleigh Wake Citizens Association*, 827 F.3d 333, 342 (4th Cir. 2016)—which

similarly concerned county commission and school board districts—confirms that the Court can and must use its broad, equitable authority to remedy the undisputed constitutional violations at issue in this case.

## ARGUMENT

### I. Plaintiffs are Likely to Succeed on the Merits.

#### A. The key facts are not in dispute.

Legislative Intervenor-Defendants Philip E. Berger and Destin C. Hall ("Legislative Defendants") and Defendants Watauga County Board of Elections and the members of the Watauga County Board of Elections ("County Defendants" and with Legislative Defendants, "Defendants") do not dispute that (i) the Board of Commissioners and Board of Education districts in Watauga County have a population deviation of more than 9% (*see* DE 38-9 at 18); (ii) the large population deviation is not attributable to efforts to achieve more compact districts, minimize political subdivision splits, or avoid precinct splits; (iii) a desire to create partisan advantage was a significant factor in the drawing of districts (DE 38 at 2-3); (iv) the districts were drawn to disfavor urban and student voters (DE 38 at 2); (v) section 2 of Senate Bill 912 was intended to block the 2024 referendum on the Board of Commissioners from taking effect if supported by a majority of voters (DE 39 at 10); and (vi) the referendum had overwhelming support in the 2024 election. Defendants merely argue that the claims are foreclosed by unrelated Supreme Court decisions including *Rucho*. They are not.

#### B. *Rucho* does not bar Plaintiffs' claims.

The Complaint asserts five claims: malapportionment, disfavored treatment, retaliation, *Anderson-Burdick*, and viewpoint discrimination—none of which are partisan gerrymandering claims. Defendants argue that *Rucho*, a partisan gerrymandering case, not only bars Plaintiffs'

3

claims as nonjusticiable, but legitimizes malapportionment for partisan advantage and to disfavor urban and student voters. The Supreme Court has already explained that *Rucho* has no application to malapportionment claims. *Rucho*, 588 U.S. at 708-09. This Court should decline Defendants' invitation to disagree.

1. *Malapportionment claims are distinguishable from gerrymandering claims.*

Plaintiffs have not brought a gerrymandering claim. A gerrymandering claim alleges that a state has assigned voters to districts based on a factor like race or partisan affiliation "without sufficient justification." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 187 (2017); *see Rucho*, 588 U.S. at 701; *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 420 (2006) (plurality opinion) (recognizing that partisan gerrymandering claims require courts to "decid[e] how much partisan dominance is too much"). The only claim in Plaintiffs' Complaint that challenges the composition of electoral districts is the malapportionment claim. A malapportionment claim challenges the "deni[al]" of "the right of suffrage" that results from "a debasement or dilution of the weight of a citizen's vote," *Reynolds*, 377 U.S. at 555; *accord Md. Election Integrity, LLC v. Md. State Bd. of Elections*, 127 F.4th 534, 539 (4th Cir. 2025) ("[T]he 'one-person, one-vote' cases involve the dilution of votes cast in certain parts of a State relative to those cast in other parts of the State . . . .").

The Fourth Circuit has plainly explained the difference between malapportionment claims and partisan gerrymandering claims:

> In stark contrast to a mere "political gerrymandering claim," Plaintiffs allege that the Session Law violates the one person, one vote principle by creating "non-compact," "confusing" districts with maximum population deviations reaching almost 10% and that the deviation from one person, one vote is "unjustifi[ed]" and results in discrimination amongst not only political interests but also "rural" versus "urban" populations. J.A. 11, 15. In other words, Plaintiffs here have pled an equal protection claim.

4

*Wright*, 787 F.3d at 268. In so holding, the Fourth Circuit admonished a district court that "justif[ied] dismissal" of a malapportionment claim "by viewing [it] as stating a political gerrymandering claim that Plaintiffs had merely dressed in the language of a one person, one vote claim." *Id.* (cleaned up). Here, as in *Wright*, Plaintiffs have alleged a one person, one vote claim. DE 1 ¶ 121. Defendants' reliance on gerrymandering cases, like *Rucho* and *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1 (2024) is misplaced.

2. *Binding precedent establishes that partisanship is an illegitimate factor in the context of malapportionment claims.*

Even though the Supreme Court has repeatedly confirmed that states may consider partisan advantage when assigning voters to districts, *see, e.g., Hunt v. Cromartie*, 526 U.S. 541, 542 (1999), "the Supreme Court has never sanctioned partisan advantage as a legitimate justification for population deviations," *Larios v. Cox*, 300 F. Supp. 2d 1320, 1351 (N.D. Ga.), *aff'd,* 542 U.S. 947 (2004). Indeed, five years after *Hunt* confirmed that states could consider partisan advantage in redistricting, the Supreme Court affirmed the holding in *Larios* that "partisan advantage" is not a permissible basis to devalue an individual's vote when, as here, it is "bound up inextricably" with "the plainly unlawful objective of regional protection." *Id.* at 1352.

The Fourth Circuit has not only held that "*Larios* constitutes persuasive authority generally," *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 342 (4th Cir. 2016) [hereinafter *RWCA*]*; see also Wright*, 787 F.3d at 267 (2015) (finding *Larios* "persuasive"), it has extended it. In *RWCA*, the Fourth Circuit held that "an intentional effort to create a significant partisan advantage," is unquestionably "a[n] illegitimate reapportionment factor." *RWCA*, 827 F.3d at 345 (cleaned up) (quoting *Larios*, 542 U.S. at 947-49 (Stevens, J., concurring)).

5

County Defendants make no mention of the Fourth Circuit's holding in *RWCA*. Legislative Defendants insist that *RWCA* is not "dispositive" because it "acknowledged that 'some amount of partisan politics is par for the course in redistricting generally.'" DE 38 at 17 (quoting *RWCA*, 827 F.3d at 347). This "acknowledgement" by the Fourth Circuit is far outweighed by the actual holding in *RWCA*, which recognized that population deviations established to pursue partisan gains are unconstitutional. 827 F.3d at 347-48.

Legislative Defendants also argue that *RWCA* "came before *Rucho*, and post-*Rucho*, federal appellate courts have generally not upheld successful *Larios* claims." DE 38 at 17. But they neither explain how *Rucho* overruled *RWCA* nor cite any of the federal appellate decisions to which they allude. The Court should decline Defendants' invitation to rule that *Rucho* overruled *RWCA*, just as the Middle District did a few months ago. *See Williams v. Hall*, No. 1:23-CV-1057, 2025 WL 1553759, at *7 (M.D.N.C. Apr. 8, 2025), *reconsideration denied sub nom. Williams v. Hall*, No. 1:23-CV-1057, 2025 WL 1798333 (M.D.N.C. June 9, 2025).

3. *Rucho has no application to malapportionment claims.*

*Rucho*, which Defendants repeatedly invoke (*see, e.g.,* DE 38 at 8, 10-17; DE 39 at 2, 13-17), reinforces the important distinction between partisan gerrymandering claims and malapportionment claims. In *Rucho*, the Supreme Court clearly distinguished the justiciability problem that it viewed as inherent in the context of partisan gerrymandering claims from the context of one-person, one-vote claims:

> Appellees contend that if we can adjudicate one-person, one-vote claims, we can also assess partisan gerrymandering claims. But the one-person, one-vote rule is relatively easy to administer as a matter of math. The same cannot be said of partisan gerrymandering because the Constitution supplies no objective measure for assessing whether a districting map treats a political party fairly. It hardly follows from the principle that each person must have an equal say in the election of representatives that a person is

> entitled to have his political party achieve representation in some way commensurate to its share of statewide support.

*Rucho*, 588 U.S. at 708. The Court explained that "[p]artisan gerrymandering claims invariably sound in a desire for proportional representation," *id.* at 704, but the requirement that "each vote must carry equal weight" does not mean that "each party must be influential in proportion to its number of supporters," *id.* at 709.

Fundamentally, Defendants' argument that "a jurisdiction may engage in constitutional political gerrymandering" (DE 38 at 11, 16; DE 39 at 15) is irrelevant here. While partisan gerrymandering claims may be nonjusticiable, the "discernible and manageable standard" for malapportionment is simple and binding: is it more probable than not that the population deviation at issue reflects the predominance of illegitimate factors, such as partisan advantage? *RWCA*, 827 F.3d at 345; *see also Larios*, 300 F. Supp. 2d at 1354. Here, the answer is plainly "yes."

4. *Regardless of whether partisan advantage is an illegitimate factor, the predominance of illegitimate reapportionment factors is undisputed.*

Defendants also concede that the districts were drawn to systematically disfavor Boone and student voters, which are undeniably illegitimate reapportionment factors that independently prove Plaintiffs' claim. DE 38 at 2 ("S.B. 759 was drawn at the request of constituents in the county who felt like the existing at-large system resulted in a dominance of university/Boone interests over all other county interests . . ."); *see, e.g., Reynolds*, 377 U.S. at 567-68; *Symm v. United States*, 439 U.S. 1105 (1979); *Larios*, 300 F. Supp. 2d at 1351.[1]

---

[1] Legislative Defendants suggest that they do not understand "how keeping a college campus whole somehow disfavors college voters or Democratic voters." DE 38 at 22. The answer is simple: by diluting student votes and deviating from the one person, one vote principle.

Moreover, the undisputed "record evidence demonstrates that traditional, legitimate apportionment factors did **not** predominate." *RWCA*, 827 F.3d at 350. The overall population deviation between the districts in the Esselstyn Illustrative Plan is 3.43%, while the overall population deviation in the SB759 Plan is 9.7%. DE 24-2 ¶ 96 & tbl. 6, fig. 17.[2] The illustrative plan outperforms the SB 759 Plan according to population equality, on all summary measures for district compactness, and by having fewer political subdivision splits. *Id.* ¶¶ 100-04, 116-18. Thus, Mr. Esselstyn's "alternative plan shows . . . that legitimate considerations . . . utterly fail[ ] to explain or justify the high levels of deviation in the enacted plans—because those rationales could have been accomplished by a plan with virtually no population deviations." *RWCA*, 827 F.3d at

---

[2] Defendants' suggestion that the Court afford less weight to Mr. Esselstyn's conclusions because the County hired him to draw the redistricting plan approved by Watauga County voters in 2024 is unaccompanied by citations to legal authority and has no legal basis. Although an expert may be disqualified if a party previously "disclosed confidential information to the expert that is relevant to the current litigation," that issue is not presented here. *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1093 (N.D. Cal. 2004). Defendants have made no showing that Mr. Esselstyn was in possession of confidential information relevant to this litigation. Nor could they.

The instructions that the County gave Mr. Esselstyn to guide his work were, and remain, publicly available. *See* Jun. 4, 2024 Minutes, Watauga County Board of Commissioners, https://www.wataugacounty.org/App_Pages/Dept/BOC/viewminutes.aspx?id=1056 (last accessed Dec. 11, 2025). The plans that Mr. Esselstyn drew were presented to the Watauga County Board of Commissioners during a public meeting. *See* Jun. 18, 2024 Minutes, Watauga County Board of Commissioners, https://www.wataugacounty.org/App_Pages/Dept/BOC/viewminutes.aspx?id=1057 (last accessed Dec. 11, 2025). And ultimately, a plan Mr. Esselstyn drew was approved by Watauga County voters. No aspect of Mr. Esselstyn's referendum plan was confidential. Just as importantly, Plaintiffs are not challenging the plan drawn by Mr. Esselstyn; they are challenging plans drawn by the General Assembly. Plaintiffs' retention of Mr. Esselstyn, who had no involvement in drawing the General Assembly's plans, affords them no tactical advantage in this litigation and conversely inflicts no prejudice on Defendants. That is especially so given that the three County Commissioners who voted to retain Mr. Esselstyn, and who subsequently voted on the districts he drew, are Plaintiffs in this litigation.

8

350–51. Plaintiffs have met their burden by showing that the conceded, illegitimate factors predominated in the design of the districts in the plans implemented by Senate Bills 759 and 912.[3]

The only traditional redistricting criterion that County Defendants identify as justifying the population deviations in the SB 759 Plan is "grouping people together in districts who live in the same community of interest." DE 39 at 16. But that is not what the plan does. It is undisputed that the SB 759 Plan splits the Town of Boone across all five districts. DE 24-2 ¶ 104 & fig. 20. Similarly, it is undisputed that the SB 759 Plan splits the student population across all five districts. *Id.* ¶¶ 144-45 & fig. 28. The SB 759 Plan just concentrates these voters most heavily in two overpopulated districts for the unrebutted purpose of diluting their influence. Mr. Esselstyn's Illustrative Plan, which preserves the Town of Boone and the student population in just three districts, *id.* ¶¶ 104, 145, demonstrates that it is possible to outperform the SB 759 plan on maintaining communities of interest while significantly decreasing the SB 759 Plan's population deviations.

Legislative Defendants make no attempt to argue that the 9.7% population deviation in the SB 759 Plan reflects the predominance of any specific traditional redistricting criteria. Instead, they cite one racial gerrymandering case, *Alexander v. S.C. State Conf. of the NAACP*, and a concurrence from an order granting a stay in another racial gerrymandering case, to argue that plaintiffs in one-person, one-vote claims cannot prove that a factor predominates unless it is "disentangled from other factors." DE 38 at 18. But *Alexander* and *Abbott* are inapposite. *See*

---

[3] Legislative Defendants also submit that the new districts are somehow constitutional because the old districts were "grossly malapportioned." DE 38 at 20. But, as Legislative Defendants acknowledge, "until the 2024 election, the Board of Commissioners was elected on an at-large basis" (DE 39 at 3), and "the Board of Education was previously elected via an at-large election" (*id.* at 4). Thus, the presence of population deviations in the residency districts did not result in vote dilution.

9

*Larios*, 300 F. Supp. 2d at 1352. *Alexander* requires racial gerrymandering plaintiffs to disentangle race from politics because racial gerrymandering is presumptively unconstitutional while political gerrymandering is not. 602 U.S. at 9. By contrast, the Supreme Court has never held that any of the factors that predominated in the design of the SB 759 Plan are lawful justifications for vote dilution.[4]

### D. The referendum ban is unconstitutional.

Plaintiffs are also likely to succeed on the merits of their remaining claims pertaining to the referendum ban in Senate Bill 912: equal protection, retaliation, *Anderson-Burdick*, and viewpoint discrimination. As to these claims, the Legislative Defendants present two circular justifications as rational bases for its actions: the General Assembly's need to "regulate [the state's] elections" and "effectuate the will of the General Assembly." DE 38 at 23-25. But in *City of Greensboro v. Guilford Cnty. Bd. of Elections*, "the Court . . . reviewed the record, including the legislative history and transcripts of legislative debate, for any obvious reason for the different treatment of Greensboro voters," and it did not identify these justifications as sufficient. 248 F. Supp. 3d at 703-04 & n.93.

County Defendants attempt to distinguish *City of Greensboro* by disguising an effective prohibition as a delay. *See* DE 39 at 18. But this is a distinction without a difference. Whether it is a "ban" or a "delay," SB 912 disfavors Plaintiffs by singling out Watauga County as the only county in North Carolina that cannot avail itself of the referendum procedure as contemplated

---

[4] Legislative Defendants also assert that Plaintiffs' claims fail because they "have not made a clear showing that a single illegitimate factor predominated over legitimate ones." DE 38 at 18. The fact that multiple illegitimate factors drove the General Assembly's malapportionment, rather than one, does not cure the constitutional problem.

10

under state law. No legitimate interest justifies this disfavored treatment. And the impact of SB 912 places significant burdens on Plaintiffs' First Amendment rights.[5]

## II. *PURCELL* DOES NOT BAR THIS COURT FROM ENTERING INJUNCTIVE RELIEF.

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) does not bar the Court from entering preliminary injunctive relief because there is ample time to provide constitutional districts for Watauga County. The Fourth Circuit has ordered a North Carolina county to construct and implement a new electoral system in far less time—and at a much later date—than is at issue here. *RWCA*, 827 F.3d at 353-54 & n.13 (ordering new election districts in July of an election year); *see also Johnson v. Halifax Cnty.*, 594 F. Supp. 161 (E.D.N.C. 1984) (same).

Specifically, the Fourth Circuit ordered Wake County to implement new election structures in July of 2016 for the November 2016 elections for its Boards of Commissioners and Education. *RWCA*, 827 F.3d at 353-54 & n.13. On remand, just six days after the Fourth Circuit's order and the district court obtaining jurisdiction, the district court declared the challenged maps unconstitutional, considered four possible remedial scenarios, and on August 9, 2016, just thirteen weeks before election day—ordered the Board of Elections and School Board to revert to their most recent constitutional maps. Order, *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, No. 5:15-CV-156-D at *4 (E.D.N.C. Aug. 9, 2016) (attached hereto). In other words, the district court canceled the results of the March 2016 primary election for the county

---

[5] County Defendants agree that SB 912 was a direct response to the 2024 referendum. *See* DE 39 at 10. Yet they defend against the referendum ban claims because "common sense" indicates that the General Assembly's passage of SB 912 was merely an effort to undo the Board of Commissioners' resolution and not to discriminate or retaliate against voters. DE 39 at 14, 18. But the General Assembly's passage of SB 912 was—by definition and concession—meant to disfavor and punish Watauga County voters by burdening their right to a referendum and discriminating against those that supported it.

11

commissioners and ordered the Board of Education candidates to be elected by plurality vote in the general election even though the primary had already occurred. *Id.* at *16-17, 36-37.

*RWCA* demonstrates that the Court has several options to implement preliminary injunctive relief. *First*, it can require the 2026 elections for the Watauga Boards of Commissioners and Education to be held under the most recent, constitutional, at-large plans. By reverting to those methods and concluding candidate filing for these races on December 29, 2025, the Court would still afford the County Defendants one week to finalize ballot styles and conduct the 2026 elections on the existing timeline. DE 39-2 ¶¶ 28-31 (Aff. of Matthew Snyder). On the same timeline, the Court could give effect to the referendum plan for the Board of Commissioners that was overwhelming supported by voters in 2024.

*Second*, the Court could decouple the remedies for the Board of Commissioners and Board of Education contests and delay relief for the Board of Commissioners while implementing the same relief for the Board of Education that the district court implemented in *RWCA*: holding nonpartisan elections (with no primary) in November 2026 in which the winner is determined by plurality vote.

*Third*, the Court can afford the State an opportunity to submit a remedial map by moving the primary elections to the date of the May runoff election and ordering that the winner of the primary elections be determined by plurality vote. Order, *Raleigh Wake Citizens Ass'n*, No. 5:15-CV-156-D at *36-37 (E.D.N.C. Aug. 9, 2016).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction enjoining Senate Bills 759 and 912 for the 2026 elections, and ensuring that the 2026 elections are conducted in a constitutional manner.

This the 15th day of December, 2025.

                              BROOKS, PIERCE, MCLENDON,
                              HUMPHREY & LEONARD, L.L.P.

                              /s/ Eric F. Fletcher
                              Eric F. Fletcher
                              N.C. State Bar No. 54105
                              efletcher@brookspierce.com
                              Michael B. Jones
                              N.C. State Bar No. 63595
                              mjones@brookspierce.com
                              Pearson G. Cost
                              N.C. State Bar No. 60828
                              pcost@brookspierce.com
                              Post Office Box 1800
                              Raleigh, North Carolina 27602
                              Telephone: (919) 839-0300
                              Facsimile: (919) 839-0304

                              *Attorneys for Plaintiffs*

## CERTIFICATION IN COMPLIANCE WITH STANDING ORDER REGARDING USE OF ARTIFICIAL INTELLIGENCE

I hereby certify that (a) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg, and (b) every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 15th day of December, 2025.

/s/ Eric F. Fletcher

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing has been served on all parties to this action by filing the same in the Court's Case Management/Electronic Case Filing System, which will send a Notice of Electronic Filing to all counsel of record for the parties.

This the 15th day of December, 2025.

/s/ Eric F. Fletcher