UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
5:25-cv-00157-MEO-DCK

| | |
|---|---|
| WATAUGA COUNTY VOTING RIGHTS TASK FORCE, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    **MEMORANDUM AND ORDER** ) |
| WATAUGA COUNTY BOARD OF ELECTIONS, et al., | ) ) ) ) |
| Defendants. | ) ) |

**THIS MATTER** is before the Court on Plaintiffs' Motion for Preliminary Injunction, (Doc. No. 22), and the parties' briefs and exhibits. Having considered the arguments, the record, and the applicable authority, the Court **DENIES** Plaintiffs' Motion.

I. **BACKGROUND**

Plaintiffs raise federal constitutional challenges to the North Carolina General Assembly's changes to how Watauga County elects its Board of Commissioners and Board of Education. (Doc. No. 1).

On October 25, 2023, the Republican-controlled General Assembly, along party lines, enacted Senate Bill 759. N.C. Sess. Laws 2023-147, Senate Bill 759 ("S.B. 759"). (Doc. No. 1 ¶¶ 28, 29). The law established five single-member electoral districts for the Watauga County Board of Commissioners. *Id.* ¶ 32. The County would elect one commissioner from each district, with commissioners required to reside in the district from which they were elected. *Id.*

S.B. 759's five districts had a mean population of 10,817. (Doc. No. 24-2 ¶ 48). Each of the five districts had a population within 5% of the mean. *Id.* at 21–22; (Doc. No. 24-10).

| District | Population | Deviation (persons) | Deviation (%) |
|---|---|---|---|
| 1 | 11,342 | 525 | 4.85% |
| 2 | 11,354 | 537 | 4.96% |
| 3 | 10,305 | -512 | -4.73% |
| 4 | 10,646 | -171 | -1.58% |
| 5 | 10,439 | -378 | -3.49% |

(Doc. Nos. 24-2 at 21; 24-10). The total population difference, or deviation, between the largest and smallest district is 9.7%. (Doc. No. 24-10).

In response to S.B. 759, the Democrat-controlled Watauga County Board of Commissioners adopted a resolution on June 18, 2024. (Doc. No. 24-2 ¶ 38). The vote was 3-2, along party lines. (Doc. No. 39-14 at 6–7). The resolution, adopted pursuant to North Carolina General Statute § 153A-60, established a referendum for the voters of Watauga County during the November 2024 General Election. (Doc. Nos. 24-2 ¶ 38; 39-14 at 6–8). The referendum sought to undo S.B. 759's framework for electing County Commissioners. *Id.* If approved by county voters, the referendum would create three electoral districts and two county-wide at-large seats. *Id.*

Nine days after the Board of Commissioners approved the resolution, the General Assembly responded by enacting Senate Bill 912. N.C. Sess. Laws 2024-13, Senate Bill 912 ("S.B. 912"); (Doc. No. 24-2 ¶ 39). Under S.B. 912, the members of the Watauga County Board of Education would be elected from the same districts enacted in S.B. 759 for the Board of Commissioners. S.B. 912 § 1.(b); (Doc. No. 24-2 ¶ 40). S.B. 912 further provided that if the

November 2024 referendum were approved by voters, the referendum's plan would not take effect until after the 2032 general election.[1] S.B. 912 § 2; (Doc. No. 24-2 ¶ 41).

During the November 2024 General Election, which employed the S.B. 759 plan and electoral districts, Watauga County voters elected three County Commissioners and separately approved the referendum. (Doc. Nos. 23 at 10; 24-2 ¶ 44; 39-2 ¶ 37).

Approximately a year later, on October 1, 2025, Plaintiffs filed their Complaint in this action. (Doc. No. 1). The lawsuit alleges violations of the Equal Protection Clause involving malapportionment and disfavored treatment of certain Watauga County voters and multiple violations of the First Amendment. *Id.* at 24–36. A month later, on November 3, 2025, Plaintiffs moved to preliminarily enjoin S.B. 759 and S.B. 912 for the 2026 elections. (Doc. No. 22). The parties submitted documentary evidence, including expert reports, with their motion papers. The Court held a hearing on Plaintiffs' motion on January 8, 2026. The motion is now ripe for decision.

## II. LEGAL STANDARD

A preliminary injunction issued pursuant to Rule 65 of the Federal Rules of Civil Procedure is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). While a plaintiff's entitlement to preliminary injunctive relief is a matter of discretion with the Court, *see Metro. Regul. Info. Sys., Inc. v. Am. Home Realty Network, Inc.,* 722 F.3d 591, 595 (4th Cir. 2013), a plaintiff seeking a preliminary injunction may only prevail by clearly demonstrating "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

---

[1] This nullifies the referendum because the County Commission will be required to draw districts by 2034 utilizing 2030 census data. *See generally* N.C. Gen. Stat. § 115C-37(i).

[3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A movant must satisfy each of these four requirements. *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024) (citing *Winter*, 555 U.S. at 20). However, movants "need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). In sum, it is an exacting test because, according to the Supreme Court, "a preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. A plaintiff bears a "heavy burden in showing [a] likelihood of success" when it involves "a difficult and complicated area of law that is still developing." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 349 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).

"Unlike prohibitory preliminary injunctions, mandatory preliminary injunctions alter, rather than preserve, the status quo, and therefore are 'disfavored, and warranted only in the most extraordinary circumstances." *2311 Racing LLC v. NASCAR, LLC*, 139 F.4th 404, 408 (4th Cir. 2025) (quoting *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994)) (citation modified); *see also Pierce*, 97 F.4th at 209 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014)) (a mandatory injunction is "a particularly aggressive form of preliminary injunction, one that is 'disfavored' in 'any circumstance.'").

### III. DISCUSSION

As an initial matter, the Court finds that Plaintiffs seek a mandatory preliminary injunction. Watauga County has used the S.B. 759 districts since 2024, including in that year's Board of Commissioners elections. With their motion, Plaintiffs now ask the Court to require a different electoral framework and districts for Watauga County's 2026 elections for its Boards of Commissioners and Education. *See* (Doc. No. 40 at 11–12); *see also Pierce*, 97 F.4th at 209

4

("Plaintiffs dispute that they seek a mandatory injunction. But plainly the Senate district map adopted in SB 758 is already in place and constitutes the status quo.").

### A. Likelihood of Success on the Merits

#### 1. The Malapportionment Claim

Plaintiffs contend that Senate Bills 759 and 912 violate the Equal Protection Clause because they establish malapportioned electoral districts for the Watauga County Board of County Commissioners and Board of Education.

##### a. Justiciability

The parties disagree on whether Plaintiffs' malapportionment claim is justiciable. In *Rucho v. Common Cause*, the Supreme Court considered whether partisan gerrymandering presented a justiciable case or controversy under the U.S. Constitution. 588 U.S. 684, 689 (2019). The Court observed that the Framers were no strangers to electoral districting problems and that they had committed "the issue to the state legislatures, expressly checked and balanced by the Federal Congress." *Id.* at 699. "At no point was there a suggestion that the federal courts had a role to play. Nor was there any indication that the Framers had ever heard of courts doing such a thing." *Id.* Considering this history, *Rucho* held that "partisan gerrymandering claims present political questions beyond the reach of the federal courts." *Id.* at 718. The Court ultimately concluded that the plaintiffs' claims, though framed as constitutional violations, were essentially complaints about partisan gerrymandering and thus nonjusticiable. *Id.*

*Rucho* casts serious doubt on the justiciability of Plaintiffs' claim for malapportionment. Plaintiffs have styled their claim as "one person, one vote" dilution, a type of claim beyond *Rucho*'s reach. *See id.* at 708–09 (distinguishing one-person, one-vote cases from partisan redistricting cases because the former is "easy to administer as a matter of math"). Yet the crux of

5

their claims is that S.B. 759 and S.B. 912 unconstitutionally disadvantage Democratic voters in favor of Republican voters. (Doc. No. 1 ¶¶ 73–74, 123–24). Plaintiffs, in essence, ask the Court to weigh how much partisanship is too much, which is precisely the kind of political question *Rucho* explained is "beyond the reach of the federal courts." 588 U.S. at 718.

Moreover, the Supreme Court has warned that courts "must be wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare.'" *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 11 (2024) (urging such wariness where plaintiffs recast partisan gerrymandering as racial gerrymandering). The Court noted that its holding in *Rucho* "cannot be evaded with such ease." *Id.* at 21. This Court acknowledges the admonition and finds Plaintiffs' malapportionment claim is not likely to be justiciable under *Rucho*.

### b. Merits of the Malapportionment Claim

Even if justiciable, the malapportionment claim is not likely to succeed on the merits. Plaintiffs assert that "the SB 759 districts have significant population deviations." (Doc. No. 23 at 6). Yet, S.B. 759's population deviation is 9.7%. *See* (Doc. Nos. 24-2 at 55; 38-9 at 18). And the Supreme Court has instructed that a maximum deviation of less than 10% is "minor." *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016) ("We have defined as 'minor deviations' those in 'an apportionment plan with a maximum population deviation under 10%.'" (quoting *Brown v. Thomson*, 462 U.S. at 842)). "'[M]inor deviations from mathematical equality' do not, by themselves, 'make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State.'" *Id.* at 259 (quoting *Gaffney v. Cummings*, 412 U.S. 735, 745 (1973). As *Harris* further explained, "we have refused to require States to justify deviations of 9.9%." *Id.* (citing *White v. Regester*, 412 U.S. 755, 764 (1973)). Moreover, "[g]iven the inherent difficulty of measuring and comparing factors that may

6

legitimately account for small deviations from strict mathematical equality, . . . attacks on deviations under 10% will succeed only rarely, in unusual cases." *Id.*

To attack a deviation under 10%, the plaintiff "must show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors" as opposed to the "legitimate considerations incident to the effectuation of a rational state policy." *Harris*, 578 U.S. at 258–59 (citation omitted); *see also Williams v. Representative Destin Hall*, Nos. 1:23-CV-1057, 1:23-CV-1104, 2025 WL 1553759, at *6 (M.D.N.C. Apr. 8, 2025) (Rushing, J.), *reconsideration denied sub nom. Williams v. Hall*, No. 1:23-CV-1057, 2025 WL 1798333 (M.D.N.C. June 9, 2025). The Supreme Court has recognized that "in addition to the 'traditional districting principles such as compactness [and] contiguity,' *Shaw v. Reno,* 509 U.S. 630, 647 (1993), those legitimate considerations can include a state interest in maintaining the integrity of political subdivisions, *Mahan v. Howell,* 410 U.S. 315 (1973), or the competitive balance among political parties, *Gaffney v. Cummings,* 412 U.S. 735, 752 (1973) . . . [or] compliance with § 5 of the Voting Rights Act." *Harris*, 578 U.S. at 258.

Because the population deviation here falls below 10%, the deviation is presumed constitutional, requiring Plaintiffs to show that the population deviation reflects the predominance of illegitimate factors. Plaintiffs contend that the General Assembly utilized three illegitimate factors: (1) urban voters, (2) college-student voters,[2] and (3) voters who prefer Democratic candidates. (Doc. No. 23 at 8).[3] None of these groups comprise a protected classification under the

---

[2] Plaintiffs' allegations lack clarity as to whether college students or people aged 15 to 29 were the allegedly impacted population. (Doc. No. 24-2 ¶ 141).

[3] Plaintiffs cite cases involving Equal Protection claims for students and residents of certain geographies. Some involve malapportionment, and some do not. *Cf. Reynolds v. Sims*, 377 U.S. 533 (1964) *with Symm v. United States*, 439 U.S. 1105 (1979). These cases do not impact the Court's analysis, considering the minor population deviation and no showing of which, if any,

7

14th Amendment. Moreover, Plaintiffs have not shown which, if any, alleged impermissible factors predominate.[4] At their base, all three factors are rooted in partisanship.

Plaintiffs rely on the Fourth Circuit's decision in *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333 (4th Cir. 2016), to cast partisanship as an illegitimate factor. In that case, the Fourth Circuit held that "intentional effort to create a significant partisan advantage" is an "illegitimate reapportionment factor." *Raleigh Wake Citizens Ass'n*, 827 F.3d at 345 (citation modified). However, in light of *Rucho*, Plaintiffs' reliance on *Raleigh Wake Citizens Ass'n* is misplaced. In *Rucho*, the Supreme Court made clear: "determining that lines were drawn on the basis of partisanship does not indicate that the districting was improper. A permissible intent—securing partisan advantage—does not become constitutionally impermissible, like racial discrimination, when that permissible intent 'predominates.'" 588 U.S. at 711. Thus, after *Rucho*, intentional effort to create a significant partisan advantage, even when it predominates, is "permissible." *Id.* Especially where, as here, the population deviation is minor and there is a presumption of constitutionality.

As the Court in *Harris* explained, "attacks on deviations under 10% will succeed only rarely, in unusual cases." 578 U.S. at 259. This is not that rare, unusual case. Plaintiffs fail to show likelihood of success on the merits of their malapportionment claim.

2. <u>Disfavored Treatment Claim</u>

Plaintiffs next contend that S.B. 912's effect on the referendum violates the Equal Protection Clause by disfavoring Watauga County voters.

---

allegedly illegitimate factors predominate.

[4] Defendants' expert report further indicates that traditional redistricting principles were, at least to some degree, employed in creating S.B. 759's districts. *See* (Doc. No. 38-9).

8

Under North Carolina law, a county "may alter the structure of its board of commissioners" by adopting certain statutorily approved structures for its board of commissioners. N.C. Gen. Stat. § 153A-58. A board initiates such a change by adopting a resolution and then submitting a referendum to voters. *Id.* §§ 153A-58, 153A-60. If approved through referendum, "the alteration takes effect on the first Monday in December following that general election." *Id.* § 153A-62.

S.B. 912 altered this statutory framework by changing the effective date of any approved alternation to the Watauga County Board of Commissioners' structure. Specifically, S.B. 912 section 2 states:

> If a majority of the voters of Watauga County vote for any referendum conducted under Part 4 of Article 4 of Chapter 153A of the General Statutes, notwithstanding G.S. 153A-62, the alteration approved in that referendum shall take effect the first Monday in December following the 2032 general election, with all elections conducted accordingly.

S.B. 912 § 2.

Plaintiffs argue that S.B. 912 violates the Equal Protection Clause by "singl[ing] out Watauga County voters—out of all voters in the State—and prevent[ing] them alone from adopting referenda to structure their own county commission." (Doc. No. 23 at 20).

### a. Justiciability

As a threshold matter, Plaintiffs' disfavored treatment claim—like their malapportionment claim—likely falls within the Supreme Court's holding in *Rucho* and is nonjusticiable. The Court's understanding of the evidence presented to date is that the Republican-controlled General Assembly passed S.B. 759 to create electoral districts favoring Republicans. In response, the Democrat-controlled Watauga County Board of Commissioners attempted to undue the General Assembly's action by passing a resolution enabling a referendum to redraw the districts in favor of Democrats. The Republican-controlled General Assembly responded by passing S.B. 912,

9

which delays the effective date of any referendum, so as to nullify its effect, thus preserving S.B. 759's Republican-favored districts. At bottom, S.B. 912's changes to the effective date of any Watauga County referendum is part and parcel of S.B. 759's partisan redistricting. Adjudicating Plaintiffs' claim of disfavored treatment likely involves "political questions beyond the reach" of this Court. *Rucho*, 588 U.S. at 718.

b. *Merits of the Disfavored Treatment Claim*

Setting aside the applicability of *Rucho*, Plaintiffs have not demonstrated a likelihood of success on the merits of their disfavored treatment claim.

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* "Ordinarily, when a state regulation or policy is challenged under the Equal Protection Clause, unless it involves a fundamental right or a suspect class, it is presumed to be valid and will be sustained 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Veney v. Wyche*, 293 F.3d 726, 731 (4th Cir. 2002) (quoting *Heller v. Doe*, 509 U.S. 312, 319–20 (1993)). "[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

In this case—as the parties agree—the disfavored treatment claim is subject to rational basis review. There is no fundamental right to referendum, *see Kendall v. Balcerzak*, 650 F.3d 515,

522 (4th Cir. 2011), nor are Watauga County voters as a whole a suspect class. Rather, Plaintiffs argue that S.B. 912 lacks a legitimate governmental interest because "no rational interest of the State is served by withdrawing the right of self-government by means of referendum for one county's residents alone among all North Carolina voters." (Doc. No. 23 at 21–22). In support of their argument, Plaintiffs rely heavily on another district court's decision in *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 248 F. Supp. 3d 692 (M.D.N.C. 2017). In that case, the district court ultimately held "the state had no legitimate governmental interest in prohibiting Greensboro citizens from exercising referendum and initiative rights available to all other municipal citizens." *City of Greensboro*, 248 F. Supp. 3d at 705.

However, *City of Greensboro* differs from the case before this Court in important ways and is thus unpersuasive. In *City of Greensboro*, the General Assembly passed an act prohibiting Greensboro voters from "making changes to the form of city government by initiative or referendum" (the "Greensboro Act") just days before the filing period was scheduled to open for the 2015 Greensboro City Council election. *Id.* at 696. In response, the City and several of its Citizens filed a lawsuit against the Guilford County Board of Elections. *Id.* at 697. They alleged the Greensboro Act "violated the equal protection clauses of the United States and North Carolina Constitutions." *Id.* Throughout the litigation, Defendant Guilford County Board of Elections took "no position on the constitutionality" of the Greensboro Act, as it only had "a 'ministerial' role in elections." *Id.* at 695, 697. For reasons unknown to the Court, the State did not appear and thus did not identify a legitimate governmental purpose for the initiative and referendum ban. *Id.* Ultimately, the court was left to decide the Equal Protection Claim on a record that did not contain "any suggested historical or factual reason . . . for such different treatment." *Id.* at 703. With that background—or lack thereof—the court concluded that the General Assembly's action was not

11

directed or rationally related to any identifiable legitimate governmental purpose. *Id.* at 705. The County Board did not appeal the decision.

Here, unlike *City of Greensboro*, the General Assembly's motivation for passing S.B. 912 is clear and undisputed—to nullify the effects of any referendum that sought to replace S.B. 759's districts. The State has a conceivable interest in ensuring that electoral districts created by the General Assembly are not undone by lower political subdivisions of the State. *See F.C.C.*, 508 U.S. at 313 (noting that any conceivable set of facts can provide a rational basis). Further, the General Assembly's partisan redistricting efforts involve a permissible intent under *Rucho* and therefore comprise a legitimate state interest. S.B. 912's passage in response to the referendum is rationally related to these legitimate state interests. As Senator Hise testified during the debate on S.B. 912, "[t]he will of the General Assembly must be observed by the county commissioners and others. When [the General Assembly] drew districts for them . . . those actually have to be the districts. That's kind of the way laws work." (Doc. No. 38-5 at 5). Because S.B. 912 has a rational relationship to legitimate state interests,[5] Plaintiffs have not shown they are likely to succeed on the merits of their disfavored treatment claim.

3. First Amendment Claims

Finally, Plaintiffs bring multiple First Amendment claims. Plaintiffs assert that the passage of S.B. 912 violates the First Amendment (1) by retaliating against "plaintiffs for publicly expressing their opposition to Senate Bill 759 and/or associating with other Watauga County voters

---

[5] Plaintiffs assume without discussion or proffering evidence that "voters of all other North Carolina counties" are "similarly situated" to Watauga County voters for the purposes of the Equal Protection analysis. (Doc. No. 1 at ¶101). The Court need not decide whether Plaintiffs' position is correct at this stage. However, the Court notes that Plaintiffs were unable to identify any other instance where the General Assembly treated a county differently when the county had sought to overturn a state redistricting law by referendum.

12

for the purpose of organizing support for the 2024 referendum," (2) by imposing a "severe burden" by making it impossible for the referendum to take place, and (3) by infringing on the "right to cast a vote effectively for voters with only one viewpoint." (Doc. No. 1 ¶¶ 156, 164, 172).

Again, Plaintiffs' claims are likely precluded by *Rucho*. In *Rucho*, the plaintiffs made similar First Amendment claims. The North Carolina plaintiffs argued the redistricting plan violated the plaintiffs' First Amendment rights by retaliating against supporters of Democratic candidates on the basis of their political belief. 588 U.S. at 692. The Maryland plaintiffs asserted the redistricting plan "violated the First Amendment by diminishing their 'ability to elect their candidate of choice' because of their party affiliation and voting history, and by burdening their associational rights." *Id.* at 695 (citation omitted).

The Supreme Court rejected the plaintiffs' arguments, explaining that "there are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue." *Id.* at 713. "The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district." *Id.* at 713–14. Instead, the plaintiffs' argument was "that partisanship in districting should be regarded as simple discrimination against supporters of the opposing party on the basis of political viewpoint." *Id.* at 714. The Supreme Court cautioned that if the plaintiffs were correct, "any level of partisanship in districting would constitute an infringement of their First Amendment rights." *Id.* Such an approach "provides no standard for determining when partisan activity goes too far." *Id.*

Here, like in *Rucho*, S.B. 912 does not contain any restrictions on Watauga County voters' ability to engage in First Amendment activities.[6] Instead, this case simply presents an example "of

---

[6] In *Williams v. Representative Destin Hall*, another district court analyzed whether similar First Amendment claims were nonjusticiable. The district court reached the same conclusion: "Plaintiffs cannot avoid *Rucho* by styling their claims as First Amendment . . . violations." *Williams*, 2025

13

partisanship driving districting decisions." *Id.* Regardless of how Plaintiffs style their claims, they likely amount to a dispute regarding political gerrymandering that is beyond the reach of this Court.

### B. Likelihood of Irreparable Harm

Plaintiffs argue that they will suffer irreparable harm unless the Court enjoins the use of S.B. 759 and S.B. 912 in the 2026 election.

The Court is mindful that cases concerning voting rights often involve the risk of irreparable harm. *See League of Women Voters of N. Carolina*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."). This is inherent in elections because "once the election occurs, there can be no do-over and no redress." *Id.* Any injury to "voters is real and completely irreparable if nothing is done to enjoin this law." *Id.*

In this case, Plaintiffs' failure to bring their motion in a timely manner undermines their claim of irreparable harm. The General Assembly enacted S.B. 759 and S.B. 912 over eighteen months ago. Yet, Plaintiffs waited to file their Complaint until October 1, 2025, and then waited another month, until November 3, 2025, to move for a preliminary injunction. During those eighteen months, Watauga County voters used S.B. 759's challenged districts in the 2024 election. This leads to the question: if the harm at issue in this case is truly irreparable, then how can the Court help the Plaintiffs now, after the same districts were already used in the 2024 election? Put another way, how can this Court issue an injunction to prevent harm that has already occurred and cannot be repaired? Plaintiffs' delay in filing, while not dispositive, cuts against their claim of irreparable harm in this case.

The Court need not answer these questions or make a finding as to irreparable harm at this time, as Plaintiffs fail on the remaining preliminary injunction factors.

---

WL 3296273, at *7.

14

Case 5:25-cv-00157-MEO-DCK    Document 42    Filed 01/16/26    Page 14 of 17

### C. Balance of the Equities and Public Interest

The final two preliminary injunction factors consider whether "the balance of equities tips in their favor" and whether the "injunction is in the public interest." *Pierce*, 97 F.4th at 225 (quoting *Winter*, 555 U.S. at 20) (citation modified). "These factors merge when the Government is the opposing party." *Id.* (quoting *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (internal quotation marks omitted)). Plaintiffs have not shown they are likely to succeed on these factors.

The Court's analysis is guided by the *Purcell* principle. Under *Purcell*, "federal courts ordinarily should not enjoin a state's election laws in the period close to an election." *Id.* (quoting *Merrill v. Milligan*, 142 S. Ct. 879, 879–80 (2022) (Kavanaugh, J., concurring)). When "'lower federal courts contravene that principle,' the Supreme Court will stop them." *Id.* By declining to enjoin a state's elections on the eve of an election, the *Purcell* principle "protects the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election. The principle also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process." *Democratic Nat. Comm. v. Wisc. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring) (citations omitted). "When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Milligan*, 142 S. Ct. at 879–80 (Kavanaugh, J., concurring). Indeed, "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls," a risk that increases "[a]s an election draws closer." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006).

In this case, despite the General Assembly enacting S.B. 759 and S.B. 912 over eighteen

months ago, Plaintiffs waited to file their lawsuit and motion until the eve of the 2026 election. This delay placed the state at a severe disadvantage, and it impacts the *Purcell* analysis. *See Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring) (noting that *Purcell* "might be overcome" where, among other factors, a "plaintiff has not unduly delayed bringing the complaint to court"). By the time the motion was ripe for the Court's review, the election was already underway. Candidate filing opened on December 1, 2025, and ran through December 19, 2025.[7] Absentee ballots were required to be printed and made available by January 12, 2026, the same day ballots for overseas voters were required to be distributed. N.C. Gen. Stat. §163-227.10; *see also* N.C. Gen. Stat. §163-258.9; (Doc Nos. 39-2 ¶¶ 19–33).

At this point, if the Court were to enjoin the use of Senate Bills 759 and 912 for the 2026 election, new district maps would need to be adopted—and possibly even created—as it is unclear what plan the county would follow in the absence of S.B. 759. Once the new districts were determined, the Watauga County Board of Elections would need to prepare and distribute new ballots. Even the timing of the primaries would need to be adjusted. In sum, the Court's order would cause many of the "disruptive consequences the *Purcell* principle is designed to avoid." *Pierce*, 97 F.4th at 227.

Plaintiffs have failed to show that the balance of equities tips in their favor or that an injunction is in the public interest.

## IV. CONCLUSION

This case reflects a partisan political struggle between county- and state-level interests. The Republican-controlled state legislature passed a partisan redistricting measure impacting a

---

[7] Candidate Filing Period | 2026 Primary Election, North Carolina State Board of Elections, https://www.ncsbe.gov/news/events/candidate-filing-period-2026-primary-election (last visited Jan. 15, 2026).

county's Democrat-controlled board of commissioners and how they are elected. Those Democratic commissioners then passed a resolution and won a local referendum, aiming to preserve their own political power – and that of their party. The Republican-controlled state legislature then responded with a bill to nullify the county Democrats' efforts. While the Court need not decide the merits of this case at the preliminary injunction stage, Plaintiffs have not demonstrated a likelihood that their claims belong in federal court or that they would otherwise succeed on the merits. Mandatory preliminary injunctions are "warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994). This case does not meet the standard.

**IT IS, THEREFORE, ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. No. 22) is **DENIED**.

**SO ORDERED.**

Signed: January 16, 2026

Matthew E. Orso
United States District Judge